# EXHIBIT A

# EXHIBIT A-1

12/5/2019 9:28 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 38992066
By: Nelson Cuero
Filed: 12/4/2019 4:45 PM

# 2019-86194 / Court: 133

NO. _____

| | | |
|---|---|---|
| TOTAL PETROCHEMICALS & REFINING USA, INC. AND TOTAL SPECIALITIES USA, INC. | § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| INTERCONTINENTAL TERMINALS COMPANY, LLC, AND INTERCONTINENTAL TERMINALS MANAGEMENT COMPANY, | § § § § § | |
| Defendants. | § § | ____ JUDICIAL DISTRICT |

## Total's Original Petition

Total Petrochemicals & Refining USA, Inc. and Total Specialties USA, Inc. (together "Total") file this Original Petition against Defendants, Intercontinental Terminals Company, LLC ("ITC") and Intercontinental Terminals Management Company ("ITC Management").

### I.
### Discovery Control Plan

1.     Discovery in this case is intended to be conducted under Level 3 pursuant to Texas Rule of Civil Procedure 190.4.

### II.
### Statement of Relief Sought

2.     Pursuant to Rule 47(c) of the Texas Rules of Civil Procedure, Total seeks monetary relief in excess of $1,000,000 and a judgment for all other relief to which Total is entitled.

### III.
### Parties

3.     Plaintiff Total Petrochemicals & Refining USA, Inc. is a Delaware corporation

with its principal place of business in Harris County, Texas.

4.      Plaintiff Total Specialties USA, Inc. is a Delaware corporation with its principal place of business in Harris County, Texas.

5.      Defendant, ITC is a Delaware limited liability company with its principal place of business in Harris County, Texas.   ITC has availed itself of the laws and jurisdiction of the State of Texas by operating a facility in Harris County, Texas, in or around the City of Deer Park, Texas, along the Houston Ship Channel (the "ITC Facility") and by maintaining a corporate office at 1021 Main Street, Suite 1150, Houston, Texas 77002-6508.  ITC may be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

6.      Defendant, ITC Management is a Texas corporation doing business in Texas and may be served with process by and through its registered agent for service of process, Mr. Norman T. Reynolds, who offices at 800 Bering Drive, Suite 201, Houston, Texas 77057.

IV.
Jurisdiction and Venue

7.      This Court has jurisdiction over Defendants because at the time of the events in question they were doing business in Harris County, Texas, in a continuous and systematic way. ITC and ITC Management are at home in Harris County because each maintains its principal place of business in Harris County, Texas.  Defendants also are subject to jurisdiction in this Court due to their commission of a tort in Harris County, Texas.  The amount in controversy is within the jurisdictional limits of this Court.  *See* TEXAS CIV. PRAC. & REM. CODE §17.042(1). The subject matter in controversy is within the jurisdictional limits of this Court.

8.      Venue is proper in Harris County, Texas, because all or a substantial part of the events or omissions giving rise to Total's claim occurred in Harris County, Texas.  *Id.* at

2

§15.002(a)(1).

V.
Facts

A.    ITC

9.    This lawsuit arises out of damages Total sustained as a result of a fire at ITC's Facility on March 17, 2019 (the "ITC Incident").  The ITC Facility is a large petrochemical terminal located along the Houston Ship Channel.  It is approximately 265 acres and at the time of the incident described below contained 242 tanks with a storage capacity of 13 million barrels. ITC receives and services its customers' products by ship, barge, pipeline, rail and truck.

10.    ITC has a history of state and federal environmental violations.  According to the Texas Commission on Environmental Quality (TCEQ), ITC has been fined for multiple infractions involving the release of hazardous chemicals that could have been avoided.  *See* Exhibit 1 (Compliance History Report, listing numerous and repeated violations).   As described in a 2010 letter from the Harris County Attorney's Office, "on no fewer than six occasions since 2007, Harris County and/or TCEQ have investigated violations that involves significant amounts of benzene, toluene and 1,3 butadiene." Exhibit 2 (Apr. 23, 2010 Ltr. from V. Ryan, then Harris County Attorney).

B.    ITC Management

11.    Upon information and belief, ITC Management participated in the development of ITC's operating procedures, its plans for preventing accidental releases, and the training of ITC employees that resulted in the conduct complained of in this case.  According to a letter written in November 2006 by ITC Management's President (who was also a former president of ITC), ITC Management is "a management company that contracts management and consulting services to . . . ITC. . . that operates a bulk chemical liquid storage facility at Deer Park, Texas." Exhibit 3

3

(ITC/MITSUI 0001). In a case brought by another plaintiff in connection with the ITC Incident, ITC Management's President submitted an affidavit claiming that ITC Management "has never . . . been involved with the management or operation of ITC or its Deer Park Facility." Exhibit 4 (Miles Aff. ¶9). That attestation, however, is contradicted by the affiant's own correspondence. Other evidence also establishes that the affidavit fails to reflect the full truth regarding ITC Management's operations and activities. *Compare* Exhibit 4 (Miles Aff. ¶8) ("ITMC has been used since its inception for personal financial and retirement purposes, including the creation of a personal pension fund for myself and my family."), *with* Exhibit 5 (ITC Management TCEQ filing dated as of December 12, 2017, stating that ITC Management is the "owner operator" of "Intercontinental Terminals Pasadena Terminal," another "bulk liquid storage terminal").

12.     According to its Articles of Incorporation, ITC Management was formed "[t]o engage in the business of leasing as Lessee, and operating, a storage terminal in Harris County, Texas and any facilities used or useful in connection therewith or related thereto and in the business of loading, unloading, packaging and storing liquids and gases at such terminal of facilities."). Exhibit 6 (Articles of Incorporation for ITC Management's predecessor).

13.     According to affidavits filed in 2008 and 2009 on behalf of both a plaintiff and co-defendant in another litigation matter involving ITC Management:

4

3.    Intercontinental Terminals Management Co. operates the facility and land owned by Mitsui as described above for hire bulk liquid storage facility that stores a variety of chemicals and petro chemicals.  Defendant, Intercontinental Terminals Management Co. is an agent of Mitsui & Co. (U.S.A.), Inc. wherein they provided for Mitsui among other things a systematic, proactive approach to prevention of accidental releases of hazardous chemicals.  Their system includes but is not limited to the following:

    a.    A process hazard analysis;
    b.    Operating procedure;
    c.    Training;
    d.    Management of Claim;
    e.    Prestart up review;
    f.    Compliance audit; and
    g.    Accident investigation.

Exhibits 7-9 (Salas Aff. ¶4; Edmonson Aff. ¶3, Schriber Aff. ¶3).

14.    Moreover, a 2006 TCEQ compliance history report lists ITC Management as an owner of the ITC Facility:



| Site Compliance History Components | |
| --- | --- |
| 1. Has the site been in existence and/or operation for the full five year compliance period? | Yes |
| 2. Has there been a (known) change in ownership of the site during the compliance period? | Yes |
| 3. If Yes, who is the current owner? | Mitsui & Co (USA) Inc. |
| | Intercontinental Terminals Management C |
| | Intercontinental Terminals Company |

Exhibit 1 at page 8.  ITC Management remains an active entity conducting business in the state of Texas. Exhibit 10 (2018 Public Information Report).

C.    Total

15.    Total owns and operates a polypropylene plant located directly across the street from the ITC Facility and a Research and Technology Center that is adjacent to Total's polypropylene plant (together "Total's Deer Park Facility").  Total's Deer Park Facility is the largest polypropylene facility in the world.  It employs thousands of people and its polypropylene is used for everyday products and packaging such as food packaging, tapes, carpet yarns, absorbent products, caps and closures, geotextiles, small appliances, housewares,

5

disposables, outdoor furniture and toys.  Total's Deer Park Facility has direct access to the Houston Ship Channel, and the Houston Ship Channel provides one of the primary means of access to Total's Deer Park Facility.

D.      The ITC Incident

16.     On the morning of March 17, 2019, an 80,000 barrel tank containing naphtha caught fire at the ITC Facility.  Later that day, the fire spread to a second ITC tank containing xylene.  Overnight, the fire spread to six additional ITC tanks.  The eight tanks that caught fire included gasoline blends, toluene, naphtha, xylenes and blended oils.  The fire at the ITC Facility triggered a multi-week nightmare.

17.     Total's quick-attack fire truck was first on the scene to help extinguish the ITC fire.  Ultimately, the flames consumed and destroyed Total's truck.  Total also provided its Research and Technology Center as a staging area for efforts to fight the blaze.

18.     The next day, on March 18, two additional ITC tanks caught fire, bringing the total number of burning ITC tanks to ten.

19.     On March 20, 2019, the *Houston Chronicle* quoted an unidentified ITC worker as saying the fire may have been started when a tank overheated and a safety valve did not shut that tank down.  Apparently, this individual reported that it was common for the tanks to overheat, but this time the safety mechanism did not work properly.

20.     The ten-tank fire resulted in oil and hazardous materials, including toxic benzene, travelling into the environment, onto Total's property, and into Total's Deer Park Facility during and after the fire.  The fire forced evacuations, shelter-in-place orders, and the closure of Total's Deer Park Facility, as well as other surrounding businesses, the Lynchburg Ferry, and State Highway 225.

21.     On March 20, ITC publicly reported that the fire was extinguished.

22.     On March 21, air monitoring systems reported elevated levels of benzene, and additional shelter-in-place orders were issued.

23.     On March 22, a containment wall at ITC failed thereby releasing a mixture of firefighting water, foam, and petrochemicals into a drainage ditch that discharged into the Houston Ship Channel via Tucker Bayou.   As a result of the discharges, the Houston Ship Channel was closed.   Three ITC tanks also reignited, and the new fire spread to the drainage ditch.

E.     Total's Damages

24.     For the next several weeks, Total's Deer Park Facility remained either entirely closed or operating at a significantly reduced rate due to (i) elevated levels of benzene, (ii) the condition of the Houston Ship Channel, (iii) road and rail closures, and (iv) other safety concerns and property damage, all resulting from the ITC Incident.

25.     Total suffered injury to its property from the ITC Incident, including the following: (a) Total's quick-attack fire truck was destroyed in the initial fire; (b) Total had to flare fuel gas it had purchased when Total's polypropylene plant was shut down; (c) Total's Deer Park Facility was contaminated with particulate pollution from the ITC fire, including benzene; (d) Total was deprived of its right to use and enjoy its real property (the Deer Park Facility and the polypropylene plant located on that property) due to the discharge of hazardous chemicals, including benzene, as a result of the ITC Incident, which prevented Total from accessing and operating its polypropylene plant; (e) Total was deprived of its right to ingress and egress from its real property in its Deer Park Facility by the closure of the Houston Ship Channel and the disruption of rail and road access to its Deer Park Facility resulting from the ITC incident; and

(f) Total was deprived of its right to ingress and egress from its real property in Total Specialties U.S.A.'s hydro-dearomatization plant in Bayport, Texas ("Total's Bayport Facility") by the closure of the Houston Ship Channel and disruption of rail and road access resulting from the ITC Incident.

26.     Indeed, the ITC Incident caused Total's polypropylene plant to be shut down multiple times.  In doing so, Total suffered downtime, ultimately equating to lost production and sales.  Further, Total could not fulfill existing contracts, and its customers cancelled orders as a result.  Even when the polypropylene plant was re-started, Total experienced off-grade products until the plant was back to full operation.

27.     Additionally, even after Total personnel were permitted to return to work, the ITC Incident caused business at Total's Deer Park Facility to be periodically interrupted due to elevated benzene levels that required Total personnel to shelter-in-place.  The ITC Incident also caused Total's rail service to be significantly limited and forced Total's Bayport Facility to adjust its production rates due to feed supply interruptions.

28.     The forced closure of the Total's Deer Park Facility resulted in lost profits and disrupted Total's business in a number of ways.  For example, Total operates a fleet of railcars to ship product from the Total Facility to Total customers.  Total's Deer Park Facility has room only for a certain number of railcars.  Because Total's Deer Park Facility suddenly had to shut down, railcars that could not be facilitated had to be stored at the SIT storage facility and some had to be shipped to an offsite storage facility in Valle Park, Missouri.  Total incurred freight and storage expenses associated with the incremental railcar movements that it otherwise would not have incurred had the ITC Incident not occurred.

29.     In addition to causing lost profits and business disruption damages, the ITC

8

Incident forced Total to incur significant out-of-pocket costs associated with environmental containment and safety issues.

30.     The damage Defendants have caused Total to suffer is substantial.  Through this lawsuit, Total seeks the recovery of all of its harms, losses, and damages from Defendants.

VI.
Causes of Action

A.     Negligence (against ITC and ITC Management)

31.     Total re-alleges the preceding paragraphs as if set forth fully herein.

32.     ITC had a duty to exercise ordinary care, meaning the degree of care that would be used by any chemical company of ordinary prudence under the same or similar circumstances. ITC breached that duty, including but not limited to, in one of the following ways:

     a.   Failing to properly store products;

     b.   Failing to have a reliable system or device at its plant to prevent the release of hazardous chemicals;

     c.   Failing to monitor and perform work in a safe and prudent manner;

     d.   Failing to exercise reasonable and prudent care in the operations of the ITC Facility, including with regard to preventing, controlling and eliminating fire events;

     e.   Failing to develop proper operational procedures;

     f.   Failing to implement, follow and enforce proper hazard analysis;

     g.   Failing to exercise reasonable and prudent care in responding to the fire; and

     h.   Failing to properly train its staff to avoid the failures listed above.

33.     ITC Management had a duty to exercise ordinary care, meaning the degree of care that would be used by any chemical company of ordinary prudence under the same or similar

9

circumstances.   ITC Management breached that duty, including but not limited to, in one of the following ways:

  a. Failing to develop a reasonable and prudent plan for preventing the accidental release of chemicals;

  b. Failing to implement, follow and enforce proper operational and safety procedures;

  c. Failing to develop and implement a proper hazard analysis; and

  d. Failing to properly train ITC's staff to avoid the failures listed above.

34. As a direct and proximate cause of Defendants' negligence, Total suffered damages in excess of the Court's jurisdictional limits, and Total seeks recovery from Defendants of all of its actual, special, consequential, incidental, and other damages, harms and losses.

B. Negligence *per se* (against ITC and ITC Management)

35. Total re-alleges the preceding paragraphs as if set forth fully herein.

36. Defendants' actions leading up, during and after the ITC Incident violate Texas law (including without limitation the Texas Clean Air Act, Chapter 382 of the Texas Health and Safety Code, Chapter 7 of the Texas Water Code, and TCEQ rules and orders promulgated under those statutes).  Total is a member of the class whom these laws are intended to protect.  Those violations of state law have resulted in a breach of duty to Total and proximately caused Total's damages.

37. As a direct and proximate cause of Defendants' negligence *per se*, Total suffered damages in excess of the Court's jurisdictional limits, and Total seeks recovery from Defendants of all of its actual, special, consequential, incidental, and other damages, harms and losses.

C. Gross negligence (against ITC only)

38.     Total re-alleges the preceding paragraphs as if set forth fully herein.

39.     ITC's acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.     ITC consciously and wantonly neglected to take actions reasonably required to correct its past mistakes and omissions.  ITC acted with a conscious indifference to the rights, safety or welfare of others, including Total.

40.     As a direct and proximate cause of ITC's gross negligence, Total suffered damages in excess of the Court's jurisdictional limits, and Total seeks recovery from ITC of all of its actual, special, consequential, incidental, and other damages, harms and losses.

41.     Moreover, ITC's acts or omissions involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and ITC had actual, subjective awareness of the risk involved, but nevertheless processed with conscious indifference to the rights, safety, or welfare of others.  Total therefore seeks the recovery of punitive damages from ITC based on its grossly negligent conduct.

D.     Private Nuisance (against ITC and ITC Management)

42.     Total re-alleges the preceding paragraphs as if set forth fully herein.

43.     Defendants created a nuisance.  Total has a private interest not only in the Total Deer Park Facility and Total's Bayport Facility, but also in the rail, truck, and shipping lines that service those facilities and the other means of access to those facilities.  The ITC Incident substantially interfered with Total's interest in the use and enjoyment of its land and caused Total unreasonable discomfort or annoyance.  Total seeks the recovery of all of its actual, special, consequential, incidental, and other damages, harms, and losses resulting from the nuisance created by Defendants' negligence and/or abnormally dangerous conduct.  Total further seeks recovery of exemplary damages.

11

E.    Public Nuisance (against ITC and ITC Management)

44.    Total re-alleges the preceding paragraphs as if set forth fully herein.

45.    Defendants created a nuisance, and their conduct interfered with a public right. Defendants' conduct adversely affected all or a substantial part of the community.  Defendants' conduct was unreasonable because it involved a significant interference with the public's health, safety, peace, comfort, or convenience and is continuing in nature and produced a permanent or long-lasting effect that Defendants knew or should have known would have a significant effect on a public right.

46.    The harm suffered by Total as a result of the ITC Incident was different in kind from that suffered by the general public because Defendants' acts or omissions interfered with Total's ability to access, operate, and use Total's Deer Park Facility, which is across the street from the ITC Facility where the fires occurred, and Total's Bayport Facility as well.

47.    Defendants' conduct caused a special injury to Total.  Total seeks the recovery of all of its actual, special, consequential, incidental, and other damages, harms and losses resulting from the nuisance created by Defendants.  Total further seeks the recovery of exemplary damages.

F.    Trespass (against ITC only)

48.    Total re-alleges the preceding paragraphs as if set forth fully herein.

49.    ITC trespassed against Total when it physically, intentionally, and voluntarily interfered with Total's right of possession of Total's Deer Park Facility without authorization. Total had a lawful right to possess the Total Facility.  Upon information and belief, ITC's acts or omissions caused air contaminants to intrude onto Total's property, which caused injury to Total's right of possession.  Total suffered actual and substantial damages.

12

50.     Accordingly, Total seeks recovery of all of its actual, special, consequential, incidental, and other damages, harms and losses, including cost of restoration or repair, loss of use of land, loss of expected profits from use of land, loss of market value of land, loss of market value of buildings, and lost profits, caused by ITC's trespass.   Total also seeks recovery of exemplary damages.

VII.
Conditions Precedent

51.     All conditions precedent to Total's claim for relief have been performed, have occurred, or have been waived.

VIII.
Preservation of Evidence

52.     Total requests and demands that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the ITC Incident or damages resulting therefrom, including but not limited to statements, photographs, videotapes, audiotapes, surveillance or security tapes, business records, incident reports, periodic reports, telephone call slips or records, text messages, correspondence, facsimiles, email and voicemail related to the ITC Incident or damages.  Failure to preserve such evidence will constitute spoliation of evidence.

IX.
Request for Disclosures

53.     Pursuant to Texas Rule of Civil Procedure 194, Total requests that ITC and ITC Management disclose within fifty (50) days of service of this suit, the information and materials described in Texas Rule of Civil Procedure 194.2(a)-(l).

X.
Jury Demand

54.     Total demands a jury trial and tenders the appropriate fee with this petition.

13

## XI.
## Prayer

Total requests that Defendants be served with process, that they be required to appear and answer in this lawsuit, and that after trial or other final hearing on the merits, the Court enter a judgment awarding Total:

i.     Its actual, special, consequential, incidental, and other damages, harms, and losses, including but not limited to loss of market value of land, cost of repair, loss of use of land, out of pocket damages, lost profits, and loss of business goodwill;

ii.    Pre-judgment and post-judgment interest at the highest rate allowed by law;

iii.   Exemplary damages in an amount determined sufficient under the applicable guiding legal principles;

iv.    Costs of court; and

v.     Any and all further relief, either at law or in equity, general or special, to which Total may show itself entitled.

Respectfully submitted,

SUSMAN GODFREY LLP

By:_____

      Shawn Raymond
      State Bar No. 24009236
      Erica W. Harris
      State Bar No. 00797697
      Michael C. Kelso
      State bar No. 24092617
      1000 Louisiana Street, Suite 5100
      Houston, Texas 77002
      Telephone:    (713) 651-9366
      Facsimile:    (713) 654-6666
      sraymond@susmangodfrey.com
      eharris@susmangodfrey.com
      mkelso@susmangodfrey.com

Attorneys for Plaintiffs,
Total Petrochemicals &
Refining USA, Inc. and Total
Specialties USA, Inc.

2019-86194 / Court: 133

# EXHIBIT 1

# EXECUTIVE SUMMARY - ENFORCEMENT MATTER

**DOCKET NO.:** 2006-1017-AIR-E    **TCEQ ID:** RN100210806    **CASE NO.:** 30290

**RESPONDENT NAME:** Intercontinental Terminals Company

**ORDER TYPE:**

| X 1660 AGREED ORDER | __FINDINGS AGREED ORDER | __AMENDED ORDER | __IMMI ENDA |
|---|---|---|---|
| __SHUTDOWN ORDER | __FINDINGS DEFAULT ORDER | __EMERGENCY ORDER | |

**CASE TYPE:**

| __AGRICULTURE | X AIR | __INDUSTRIAL AND HAZARDOUS WASTE | __MUNIC |
|---|---|---|---|
| __OCCUPATIONAL CERTIFICATION | __PETROLEUM STORAGE TANKS | __PUBLIC WATER SUPPLY | __RADIO |
| __MULTI-MEDIA (check all that apply) | __SEWAGE SLUDGE | __UNDERGROUND INJECTION CONTROL | __USED ( |
| __USED OIL FILTER | __WATER QUALITY | | |

**SITE WHERE VIOLATION(S) OCCURRED:** Intercontinental Terminals Deer Park Terminal, 1943 Battleground Road, La Porte, Harris Co

**TYPE OF OPERATION:** Multi-product bulk liquid storage and distribution terminal

**SMALL BUSINESS:** _____ Yes    _X_ No

**OTHER SIGNIFICANT MATTERS:** There are no complaints. There is no record of additional pending enforcement actions regarding this fa

**INTERESTED PARTIES:** No one other than the ED and the Respondent has expressed an interest in this matter.

**COMMENTS RECEIVED:** The *Texas Register* comment period expired on December 18, 2006. No comments were received.

**CONTACTS AND MAILING LIST:**
  **TCEQ Attorney/SEP Coordinator:** None
  **TCEQ Enforcement Coordinator:** Ms. Trina Grieco, Enforcement Division, Enforcement Section III, MC R-13, (210) 403-4006; Mr. S
MC 219, (512) 239-1896
  **TCEQ Field Investigator:** Mr. Alan Mallory, Houston Regional Office, MC R-12, (713) 767-3764
  **Respondent:** Mr. Carl Holley, Environmental Health & Safety Manager, Intercontinental Terminals Company, P.O. Box 698, Deer Par
        Mr. R. L. Commander, Senior Vice President-Operations, Intercontinental Terminals Company, P.O. Box 698, Deer Park
  **Respondent's Attorney:** Not represented by counsel on this enforcement matter

Attachment: Site Compliance History

RESPONDENT'S NAME: Intercontinental Terminals Company

DOCKET NO.: 2006-1017-AIR-E

**VIOLATION SUMMARY CHART:**

| VIOLATION INFORMATION | PENALTY CONSIDERATIONS | CORRECTIVE |
|---|---|---|
| **Type of Investigation:** ___ Complaint ___ Routine  ___ Enforcement Follow-up __X__ Records Review  **Date of Complaint Relating to this Case:** None  **Date of Investigation Relating to this Case:** April 20, 2006  **Date of NOE Relating to this Case:** July 5, 2006 (NOE)  **Background Facts:** This was a routine investigation. One violation was documented.  **AIR**  Failed to prevent unauthorized emissions and to route all emissions from Storage Tank 50-2 to the TK 50-2 Flare, emissions point number ("EPN") FL-50-2 (Incident 71787). Specifically, 3,425 pounds of the hazardous air pollutant and highly reactive volatile organic compound 1,3-butadiene were released from the Tank 50-2 Emergency Atmospheric relief valve, EPN TANK 50-2 PSV A, during an emissions event which occurred on February 15, 2006 and lasted 4 minutes. These emissions are not authorized by the permit. Since the emissions event was avoidable, Intercontinental Terminals Company failed to meet the demonstration criteria for an affirmative defense in 30 TEX. ADMIN. CODE § 101.222 [30 TEX. ADMIN. CODE § 116.115(c), Air Permit No. 1078, Special Conditions 5 and 14 and TEX. HEALTH & SAFETY CODE § 382.085(b)]. | **Total Assessed:** $9,500  **Total Deferred:** $1,900  __X__ Expedited Settlement  ___ Financial Inability to Pay  **SEP Conditional Offset:** $0  **Total Paid to General Revenue:** $7,600  **Site Compliance History Classification:** ___High __X__ Avg. ___Poor  **Person Compliance History Classification:** ___High __X__ Avg. ___Poor  **Major Source:** __X__ Yes ___ No  **Applicable Penalty Policy:** September 2002 | **Ordering Provisions:**  The Order will require the  a. Within 30 days after the implement measures desig to the same cause; and  b. Within 45 days after the written certification to den Provision a. |

Attachment: Site Compliance History

Page 1 of 4    01/22/07    H:\Agreed Orders\Intercontinental Terminals Company-2006-1017-AIR\ITMC Revised PCW.wb3

## Penalty Calculation Worksheet (PCW)

**TCEQ**    *Policy Revision 2 (September 2002)*    *PCW Revision April 25, 2006*

| DATES | Assigned | 10-Jul-2006 | | | |
|---|---|---|---|---|---|
| | PCW | 14-Jul-2006 | Screening | 19-Jul-2006 | EPA Due | 01-Apr-2007 |

### RESPONDENT/FACILITY INFORMATION

| | | | | |
|---|---|---|---|---|
| Respondent | Intercontinental Terminals Company | | | |
| Reg. Ent. Ref. No. | RN100210806 | | | |
| Facility/Site Region | 12-Houston | | Major/Minor Source | Major Source |

### CASE INFORMATION

| | | | | |
|---|---|---|---|---|
| Enf./Case ID No. | 30290 | | No. of Violations | 1 |
| Docket No. | 2006-1017-AIR-E | | Order Type | 1660 |
| Media Program(s) | Air Quality | | Enf. Coordinator | Trina Grieco |
| Multi-Media | | | EC's Team | Enforcement Team 6 |
| Admin. Penalty $ Limit Minimum | $0 | Maximum | $10,000 | |

## Penalty Calculation Section

| | | |
|---|---|---|
| **TOTAL BASE PENALTY (Sum of violation base penalties)** | *Subtotal 1* | $5,000 |

### ADJUSTMENTS (+/-) TO SUBTOTAL 1

Subtotals 2-7 are obtained by multiplying the Total Base Penalty (Subtotal 1) by the indicated percentage.

| | | | | |
|---|---|---|---|---|
| Compliance History | | 90% Enhancement | *Subtotals 2, 3, & 7* | $4,500 |

Notes: Penalty enhancement due to 4 NOVs for same or similar violations, 17 NOVs issued for non-similar violation (this includes 12 self-reported effluent violations), and 2 agreed orders with denial of liability issued for this plant. Penalty reduction due to 2 Notice of Audit letters and 1 disclosure of violations submitted by the respondent.

| | | | | |
|---|---|---|---|---|
| Culpability | No | 0% Enhancement | *Subtotal 4* | $0 |

Notes: The Respondent does not meet culpability criteria.

| | | | | |
|---|---|---|---|---|
| Good Faith Effort to Comply | | 0% Reduction | *Subtotal 5* | $0 |

| | Before NOV | NOV to EDPRP/Settlement Offer |
|---|---|---|
| Extraordinary | | |
| Ordinary | | |
| N/A | X | *(mark with a small x)* |

Notes: The Respondent does not meet the good faith criteria.

| | | | | |
|---|---|---|---|---|
| Economic Benefit | | 0% Enhancement* | *Subtotal 6* | $0 |
| Total EB Amounts | $145 | *Capped at the Total EB $ Amount* | | |
| Approx. Cost of Compliance | $2,000 | | | |

| | | |
|---|---|---|
| **SUM OF SUBTOTALS 1-7** | *Final Subtotal* | $9,500 |

| | | |
|---|---|---|
| **OTHER FACTORS AS JUSTICE MAY REQUIRE** | *Adjustment* | $0 |

Reduces or enhances the Final Subtotal by the indicated percentage. *(Enter number only; e.g. -30 for -30%.)*

Notes:

| | | |
|---|---|---|
| | **Final Penalty Amount** | $9,500 |

| | | |
|---|---|---|
| **STATUTORY LIMIT ADJUSTMENT** | **Final Assessed Penalty** | $9,500 |

| | | | |
|---|---|---|---|
| **DEFERRAL** | 20% Reduction | **Adjustment** | -$1,900 |

Reduces the Final Assessed Penalty by the indicted percentage. *(Enter number only; e.g. 20 for 20% reduction.)*

Notes: A deferral is offered for expedited settlement.

| | | |
|---|---|---|
| **PAYABLE PENALTY** | | $7,600 |

| | | | |
|---|---|---|---|
| **Screening Date** 19-Jul-2006 | | **Docket No.** 2006-1017-AIR-E | **PCW** |
| **Respondent** Intercontinental Terminals Company | | | *Policy Revision 2 (September 2002)* |
| **Case ID No.** 30290 | | | *PCW Revision April 26, 2006* |
| **Reg. Ent. Reference No.** RN100210806 | | | |
| **Media [Statute]** Air Quality | | | |
| **Enf. Coordinator** Trina Grieco | | | |

## Compliance History Worksheet

**>> Compliance History *Site Enhancement* (Subtotal 2)**

| Component | Number of... | Enter Number Here | Adjust. |
|---|---|---|---|
| NOVs | Written NOVs with same or similar violations as those in the current enforcement action *(number of NOVs meeting criteria)* | 4 | 20% |
| | Other written NOVs | 17 | 34% |
| Orders | Any agreed final enforcement orders containing a denial of liability *(number of orders meeting criteria)* | 2 | 40% |
| | Any adjudicated final enforcement orders, agreed final enforcement orders without a denial of liability, or default orders of this state or the federal government, or any final prohibitory emergency orders issued by the commission | 0 | 0% |
| Judgments and Consent Decrees | Any non-adjudicated final court judgments or consent decrees containing a denial of liability of this state or the federal government *(number of judgements or consent decrees meeting criteria)* | 0 | 0% |
| | Any adjudicated final court judgments and default judgments, or non-adjudicated final court judgments or consent decrees without a denial of liability, of this state or the federal government | 0 | 0% |
| Convictions | Any criminal convictions of this state or the federal government *(number of counts)* | 0 | 0% |
| Emissions | Chronic excessive emissions events *(number of events)* | 0 | 0% |
| Audits | Letters notifying the executive director of an intended audit conducted under the Texas Environmental, Health, and Safety Audit Privilege Act, 74th Legislature, 1995 *(number of audits for which notices were* | 2 | -2% |
| | Disclosures of violations under the Texas Environmental, Health, and Safety Audit Privilege Act, 74th Legislature, 1995 *(number of audits for which violations were disclosed)* | 1 | -2% |
| | | *Please Enter Yes or No* | |
| Other | Environmental management systems in place for one year or more | No | 0% |
| | Voluntary on-site compliance assessments conducted by the executive director under a special assistance program | No | 0% |
| | Participation in a voluntary pollution reduction program | No | 0% |
| | Early compliance with, or offer of a product that meets future state or federal government environmental requirements | No | 0% |
| | | **Adjustment Percentage (Subtotal 2)** | **90%** |

**>> Repeat Violator (Subtotal 3)**

| | | |
|---|---|---|
| No | **Adjustment Percentage (Subtotal 3)** | **0%** |

**>> Compliance History *Person Classification* (Subtotal 7)**

| | | |
|---|---|---|
| Average Performer | **Adjustment Percentage (Subtotal 7)** | **0%** |

**>> Compliance History Summary**

| | |
|---|---|
| **Compliance History Notes** | Penalty enhancement due to 4 NOVs for same or similar violations, 17 NOVs issued for non-similar violation (this includes 12 self-reported effluent violations), and 2 agreed orders with denial of liability issued for this plant. Penalty reduction due to 2 Notice of Audit letters and 1 disclosure of violations submitted by the respondent. |

| | |
|---|---|
| **Total Adjustment Percentage (Subtotals 2, 3, & 7)** | **90%** |

**PCW**

| | |
|---|---|
| **Screening Date** | 19-Jul-2006 |
| **Respondent** | Intercontinental Terminals Company |
| **Case ID No.** | 30290 |
| **Reg. Ent. Reference No.** | RN100210806 |
| **Media [Statute]** | Air Quality |
| **Enf. Coordinator** | Trina Grieco |

**Docket No.** 2006-1017-AIR-E

*Policy Revision 2 (September 2002)*
*PCW Revision April 25, 2006*

**Violation Number** 1

**Primary Rule Cite(s)**
30 Tex. Admin. Code § 116.115(c), Air Permit No. 1078, Special Conditions 5 and 14

**Secondary Rule Cite(s)**
Tex. Health & Safety Code § 382.085(b)

**Violation Description**
Failed to prevent unauthorized emissions and to route all emissions from Storage Tank 50-2 to the TK 50-2 Flare, emissions point number ("EPN") FL-50-2 (Incident 71787). Specifically, 3,425 pounds of the hazardous air pollutant and highly reactive volatile organic compound 1,3-butadiene were released from the Tank 50-2 Emergency Atmospheric relief valve, EPN TANK 50-2 PSV A, during an emissions event which occurred on February 15, 2006 and lasted 4 minutes. These emissions are not authorized by the permit. Since the emissions event was avoidable, Intercontinental Terminals Management Company failed to meet the demonstration criteria for an affirmative defense in 30 Tex. Admin. Code § 101.222.

**Base Penalty** | $10,000

---

**>> Environmental, Property and Human Health Matrix**

**Harm**

| | | Major | Moderate | Minor |
|---|---|---|---|---|
| OR | Actual Release | | X | |
| | Potential | | | |

**Percent** | 50%

**>> Programmatic Matrix**

| Falsification | Major | Moderate | Minor |
|---|---|---|---|
| | | | |

**Percent** | |

**Matrix Notes**
Human health or the environment in the Houston-Galveston nonattainment area has been exposed to a significant amount of pollutants which did not exceed levels that are protective of human health or environmental receptors as a result of the violation.

**Adjustment** | -$5,000

**Base Penalty Subtotal** | $5,000

---

**Violation Events**

Number of Violation Events | 1

1 | Number of violation days

| mark only one use a small x | | |
|---|---|---|
| | daily | |
| | monthly | |
| | quarterly | |
| | semiannual | |
| | annual | |
| | single event | X |

**Violation Base Penalty** | $5,000

One single event is recommended.

---

**Economic Benefit (EB) for this violation**

**Estimated EB Amount** | $145

**Statutory Limit Test**

**Violation Final Penalty Total** | $9,500

**This violation Final Assessed Penalty (adjusted for limits)** | $9,500

# Economic Benefit Worksheet

| Respondent | Intercontinental Terminals Company |
|---|---|
| Case ID No. | 30290 |
| Reg. Ent. Reference No. | RN100210806 |
| Media [Statute] | Air Quality |
| Violation No. | 1 |

| | | Percent Interest | Years of Depreciation |
|---|---|---|---|
| | | 5.0 | 15 |

| Item Description | Item Cost No commas or $ | Date Required | Final Date | Yrs | Interest Saved | Onetime Costs | EB Amount |
|---|---|---|---|---|---|---|---|
| **Delayed Costs** | | | | | | | |
| Equipment | | | | 0.0 | $0 | $0 | $0 |
| Buildings | | | | 0.0 | $0 | $0 | $0 |
| Other (as needed) | $2,000 | 15-Feb-2006 | 01-Mar-2007 | 1.0 | $7 | $138 | $145 |
| Engineering/construction | | | | 0.0 | $0 | $0 | $0 |
| Land | | | | 0.0 | $0 | n/a | $0 |
| Record Keeping System | | | | 0.0 | $0 | n/a | $0 |
| Training/Sampling | | | | 0.0 | $0 | n/a | $0 |
| Remediation/Disposal | | | | 0.0 | $0 | n/a | $0 |
| Permit Costs | | | | 0.0 | $0 | n/a | $0 |
| Other (as needed) | | | | 0.0 | $0 | n/a | $0 |

Notes for DELAYED costs: Estimated cost to implement measures designed to prevent the recurrence of emissions events due to the same cause. Date required based on the date of the release. Final date based on the projected compliance date.

| Item Description | | Date Required | Final Date | Yrs | Interest Saved | Onetime Costs | EB Amount |
|---|---|---|---|---|---|---|---|
| **Avoided Costs** | ANNUALIZE [1] avoided costs before entering item (except for one-time avoided costs) | | | | | | |
| Disposal | | | | 0.0 | $0 | $0 | $0 |
| Personnel | | | | 0.0 | $0 | $0 | $0 |
| Inspection/Reporting/Sampling | | | | 0.0 | $0 | $0 | $0 |
| Supplies/equipment | | | | 0.0 | $0 | $0 | $0 |
| Financial Assurance [2] | | | | 0.0 | $0 | $0 | $0 |
| ONE-TIME avoided costs [3] | | | | 0.0 | $0 | $0 | $0 |
| Other (as needed) | | | | 0.0 | $0 | $0 | $0 |

Notes for AVOIDED costs:

| Approx. Cost of Compliance | $2,000 | | TOTAL | $145 |
|---|---|---|---|---|

# Compliance History

Customer/Respondent/Owner-Operator:   CN601470222   Intercontinental Terminals Company   Classification: AVERAGE   Rating: 1.57

Regulated Entity:   RN100210806   INTERCONTINENTAL TERMINALS   Classification: AVERAGE   Site Rating: 1.57
DEER PARK TERMINAL

ID Number(s):

| | | |
|---|---|---|
| AIR OPERATING PERMITS | ACCOUNT NUMBER | HG0403N |
| AIR OPERATING PERMITS | PERMIT | 1061 |
| WASTEWATER | PERMIT | WQ0001984000 |
| WASTEWATER | PERMIT | TPDES0068349 |
| WASTEWATER | PERMIT | TX0068349 |
| AIR NEW SOURCE PERMITS | PERMIT | 1078 |
| AIR NEW SOURCE PERMITS | PERMIT | 1797 |
| AIR NEW SOURCE PERMITS | PERMIT | 1971 |
| AIR NEW SOURCE PERMITS | PERMIT | 2837 |
| AIR NEW SOURCE PERMITS | PERMIT | 11781 |
| AIR NEW SOURCE PERMITS | PERMIT | 13674 |
| AIR NEW SOURCE PERMITS | PERMIT | 14294 |
| AIR NEW SOURCE PERMITS | PERMIT | 14296 |
| AIR NEW SOURCE PERMITS | PERMIT | 16015 |
| AIR NEW SOURCE PERMITS | PERMIT | 10581 |
| AIR NEW SOURCE PERMITS | PERMIT | 15075 |
| AIR NEW SOURCE PERMITS | PERMIT | 22980 |
| AIR NEW SOURCE PERMITS | PERMIT | 24140 |
| AIR NEW SOURCE PERMITS | PERMIT | 24909 |
| AIR NEW SOURCE PERMITS | PERMIT | 31860 |
| AIR NEW SOURCE PERMITS | PERMIT | 35631 |
| AIR NEW SOURCE PERMITS | PERMIT | 43548 |
| AIR NEW SOURCE PERMITS | PERMIT | 44392 |
| AIR NEW SOURCE PERMITS | PERMIT | 45706 |
| AIR NEW SOURCE PERMITS | PERMIT | 47853 |
| AIR NEW SOURCE PERMITS | PERMIT | 50149 |
| AIR NEW SOURCE PERMITS | ACCOUNT NUMBER | HG0403N |
| AIR NEW SOURCE PERMITS | PERMIT | 52721 |
| AIR NEW SOURCE PERMITS | REGISTRATION | 76266 |
| AIR NEW SOURCE PERMITS | AFS NUM | 0153 |
| AIR NEW SOURCE PERMITS | PERMIT | 1078 |
| AIR NEW SOURCE PERMITS | REGISTRATION | 74105 |
| PUBLIC WATER SYSTEM/SUPPLY | REGISTRATION | 1011622 |
| VOLUNTARY CLEANUP PROGRAM | ID NUMBER | 1269 |
| INDUSTRIAL AND HAZARDOUS WASTE GENERATION | EPA ID | TXD073912974 |
| INDUSTRIAL AND HAZARDOUS WASTE GENERATION | SOLID WASTE REGISTRATION # (SWR) | 30966 |
| WATER LICENSING | LICENSE | 1011622 |
| IHW CORRECTIVE ACTION | SOLID WASTE REGISTRATION # (SWR) | 30966 |
| WASTE WATER GENERAL PERMIT | PERMIT | TXG670028 |

Location:   1943 BATTLEGROUND RD, LA PORTE, TX, 77571   Rating Date: September 01 05   Repeat Violator: N

TCEQ Region:   REGION 12 - HOUSTON

Date Compliance History Prepared:   January 29, 2007

Agency Decision Requiring Compliance History:   Enforcement

Compliance Period:   July 18, 2001 to July 18, 2006

TCEQ Staff Member to Contact for Additional Information Regarding this Compliance History

Name:   Trina Grieco   Phone:   (210) 403-4006

## Site Compliance History Components

1. Has the site been in existence and/or operation for the full five year compliance period?   Yes

2. Has there been a (known) change in ownership of the site during the compliance period?   Yes

3. If Yes, who is the current owner?   Mitsui & Co (USA) Inc.
Intercontinental Terminals Management C
Intercontinental Terminals Company

4. if Yes, who was/were the prior owner(s)?   Mitsui & Co (USA) Inc.

Intercontinental Terminals Company

5. When did the change(s) in ownership occur?                                    7/29/2003

**Components (Multimedia) for the Site :**

A.    Final Enforcement Orders, court judgements, and consent decrees of the state of Texas and the federal government.

      Effective Date: 12/12/2002                    ADMINORDER 2002-0248-AIR-E

      Classification: Minor

      Citation:    30 TAC Chapter 101, SubChapter A 101.20(2)
                40 CFR Part 61, Subpart V 61.242-1(d)

                5C THC Chapter 382, SubChapter A 382.085(a)

      Description:  Failure to mark one valve and one flange next to valve No. 11 associated with tank No. 80-15 in benzene service and 3 flanges next to valve No. 6, valve No. 8 and valve No. 9, respectively, associated with Tank No. 80-20, all in benzene service.

      Classification: Moderate

      Citation:    30 TAC Chapter 101, SubChapter A 101.20(2)
                30 TAC Chapter 116, SubChapter B 116.115(c)

                40 CFR Part 61, Subpart V 61.242-6(a)(1)
                5C THC Chapter 382, SubChapter A 382.085(b)

      Rqmt Prov:  SC3E PERMIT
                SC8 PERMIT

      Description:  Failure to install a cap, blind flange or plug on an open ended line on valve No. 1 on tank No. 80-14, in benzene service.

      Classification: Moderate

      Citation:    30 TAC Chapter 116, SubChapter B 116.115(c)
                5C THC Chapter 382, SubChapter A 382.085(b)

      Rqmt Prov:  SC3E PERMIT
                SC8 PERMIT

      Description:  Failure to install a cap, blind flange or plug on open ended lines on a line next to valve No. 12 on tank No. 100-2 and a line next to valve No. 10 on tank No. 100-4, both of which are in methanol service.

      Effective Date: 11/06/2005                    ADMINORDER 2005-0486-AIR-E

      Classification: Moderate

      Citation:    30 TAC Chapter 116, SubChapter B 116.115(c)
                5C THC Chapter 382, SubChapter A 382.085(b)

      Rqmt Prov:  Special Condition No. 1 PERMIT

      Description:  Failure to prevent 1,127 pounds of unauthorized butadiene emissions from the tank 50-2 dryer pressure relief valve during an emissions event on August 16, 2004 that lasted four minutes.

B.    Any criminal convictions of the state of Texas and the federal government.

      N/A

C.    Chronic excessive emissions events.

      N/A

D.    The approval dates of investigations. (CCEDS Inv. Track. No.)

|    |            |          |
|----|------------|----------|
| 1  | 12/27/2001 | (194870) |
| 2  | 12/27/2002 | (194871) |
| 3  | 01/23/2002 | (194874) |
| 4  | 01/24/2003 | (194875) |
| 5  | 05/30/2006 | (467474) |
| 6  | 06/21/2005 | (423380) |
| 7  | 03/31/2004 | (260352) |
| 8  | 02/28/2006 | (457141) |
| 9  | 02/28/2003 | (23130)  |
| 10 | 03/30/2004 | (332973) |
| 11 | 03/16/2005 | (371216) |
| 12 | 05/30/2006 | (467405) |
| 13 | 10/21/2005 | (434379) |
| 14 | 12/17/2004 | (290794) |

15  02/23/2006  (455891)
16  02/27/2006  (456566)
17  02/23/2004  (310963)
18  03/01/2004  (264458)
19  02/16/2006  (437127)
20  10/26/2004  (292361)
21  11/11/2004  (291208)
22  02/21/2005  (341749)
23  02/23/2005  (385325)
24  03/22/2004  (310966)
25  04/23/2004  (310967)
26  03/22/2005  (385326)
27  01/24/2005  (385327)
28  05/21/2004  (310969)
29  08/31/2004  (291039)
30  06/22/2004  (310971)
31  02/25/2006  (456934)
32  12/02/2005  (433872)
33  06/30/2004  (274189)
34  08/25/2003  (310974)
35  09/23/2003  (310976)
36  07/22/2005  (444195)
37  05/30/2006  (467313)
38  08/23/2005  (444196)
39  10/23/2003  (310978)
40  09/23/2005  (444197)
41  02/21/2006  (474602)
42  03/21/2002  (194829)
43  11/24/2003  (310979)
44  12/29/2003  (310980)
45  01/23/2004  (310981)
46  03/27/2006  (474603)
47  02/25/2002  (194832)
48  02/24/2003  (194833)
49  05/16/2003  (247208)
50  02/28/2006  (457243)
51  03/21/2002  (194835)
52  03/24/2003  (194836)
53  04/07/2006  (474604)
54  07/20/2004  (251421)
55  10/19/2004  (335995)
56  07/26/2004  (358407)
57  11/17/2004  (340802)
58  08/20/2004  (358408)
59  02/27/2006  (457165)
60  03/30/2006  (454492)
61  09/21/2004  (358409)
62  04/24/2002  (194840)
63  10/22/2004  (358410)
64  10/24/2005  (474605)
65  04/21/2003  (194841)
66  09/02/2005  (404693)
67  11/23/2004  (358411)
68  02/21/2006  (455166)
69  12/17/2004  (358412)
70  08/26/2002  (6572)
71  10/18/2004  (335632)
72  05/20/2002  (194844)
73  05/23/2003  (194845)
74  10/24/2005  (474606)
75  11/12/2003  (254844)
76  07/05/2006  (464712)
77  02/28/2006  (457151)
78  06/20/2002  (194848)
79  07/08/2002  (3811)
80  06/24/2003  (194849)
81  11/21/2005  (474607)

| 82 | 07/24/2001 | (194851) |
| 83 | 12/27/2005 | (474608) |
| 84 | 05/24/2005 | (380693) |
| 85 | 02/23/2006 | (455833) |
| 86 | 07/22/2002 | (194852) |
| 87 | 07/23/2003 | (194853) |
| 88 | 08/23/2005 | (401737) |
| 89 | 08/23/2001 | (194855) |
| 90 | 10/08/2004 | (335073) |
| 91 | 08/23/2002 | (194856) |
| 92 | 01/25/2006 | (474609) |
| 93 | 08/20/2001 | (79310) |
| 94 | 08/20/2001 | (79311) |
| 95 | 05/18/2006 | (502372) |
| 96 | 12/06/2001 | (79312) |
| 97 | 06/20/2006 | (502373) |
| 98 | 12/18/2001 | (79313) |
| 99 | 09/24/2001 | (194858) |
| 100 | 05/30/2006 | (467456) |
| 101 | 02/07/2002 | (79314) |
| 102 | 09/23/2002 | (194859) |
| 103 | 10/23/2002 | (194860) |
| 104 | 08/09/2005 | (403880) |
| 105 | 02/27/2006 | (457161) |
| 106 | 10/19/2001 | (194862) |
| 107 | 08/23/2005 | (404912) |
| 108 | 10/23/2002 | (194863) |
| 109 | 04/04/2002 | (79315) |
| 110 | 08/18/2005 | (404302) |
| 111 | 04/17/2002 | (79316) |
| 112 | 07/01/2002 | (79317) |
| 113 | 05/17/2006 | (454514) |
| 114 | 11/19/2001 | (194866) |
| 115 | 11/25/2002 | (194867) |
| 116 | 04/22/2005 | (423378) |
| 117 | 05/24/2005 | (423379) |

E.   Written notices of violations (NOV). (CCEDS Inv. Track. No.)

Dat  08/23/2002     (6572)

Self          NO                              Classification:   Moderate
Citation:          30 TAC Chapter 290, SubChapter D 290.41(c)(1)(F)
Description:       Failure to make available sanitary control easements for the well at the time of inspection.

Dat  05/24/2005     (380693)

Self          NO                              Classification:   Minor
Citation:          30 TAC Chapter 101, SubChapter F 101.201(g)
Description:       ITC  failed to submit the initial notification electronically using the online form on the commission's secure web server.

Self          NO                              Classification:   Moderate
Citation:          30 TAC Chapter 116, SubChapter B 116.110(a)[G]
                   5C THC Chapter 382, SubChapter A 382.085(b)
Description:       ITC  failed to prevent the increased flow, during a loading operation, into Tank 105-3.

Dat  03/30/2004     (332973)

Self          NO                              Classification:   Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
                   30 TAC Chapter 305, SubChapter F 305.125(17)
Description:       NON-RPT VIOS FOR MONIT PER OR PIPE

Self          NO                              Classification:   Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
                   30 TAC Chapter 305, SubChapter F 305.125(17)
Description:       NON-RPT VIOS FOR MONIT PER OR PIPE

Self          NO                              Classification:   Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
                   30 TAC Chapter 305, SubChapter F 305.125(17)

Description:        NON-RPT VIOS FOR MONIT PER OR PIPE

Dat  01/31/2005    (385325)
Self        YES                                  Classification:      Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
                   TWC Chapter 26 26.121(a)[G]

Description:       Failure to meet the limit for one or more permit parameter

Dat  03/31/2004    (310967)
Self        YES                                  Classification:      Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
                   TWC Chapter 26 26.121(a)[G]

Description:       Failure to meet the limit for one or more permit parameter

Dat  02/28/2005    (385326)
Self        YES                                  Classification:      Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
                   TWC Chapter 26 26.121(a)[G]

Description:       Failure to meet the limit for one or more permit parameter

Dat  12/31/2004    (385327)
Self        YES                                  Classification:      Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
                   TWC Chapter 26 26.121(a)[G]

Description:       Failure to meet the limit for one or more permit parameter

Dat  10/21/2005    (434379)
Self        NO                                   Classification:      Moderate
Citation:          30 TAC Chapter 116, SubChapter B 116.115(b)
                   5C THC Chapter 382, SubChapter A 382.085(b)
Rqmt Prov:         PERMIT IA
Description:        ITC failed to prevent a mechanical failure which resulted in a release of 85 pounds of
                   unauthorized 1,3 butadiene emissions from an emergency atmospheric relief valve for a
                   duration of 5 minutes.

Dat  09/30/2003    (310978)
Self        YES                                  Classification:      Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
                   TWC Chapter 26 26.121(a)[G]

Description:       Failure to meet the limit for one or more permit parameter

Dat  05/16/2003    (247208)
Self        NO                                   Classification:      Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
Description:       NON-RPT VIOS FOR MONIT PER OR PIPE

Dat  12/31/2003    (310981)
Self        YES                                  Classification:      Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
                   TWC Chapter 26 26.121(a)[G]

Description:       Failure to meet the limit for one or more permit parameter

Dat  09/02/2005    (404693)
Self        NO                                   Classification:      Moderate
Citation:          30 TAC Chapter 115, SubChapter C 115.212(a)(3)(B)
Description:       The RE failed to detect a leak on a transferline.
Self        NO                                   Classification:      Moderate
Citation:          30 TAC Chapter 116, SubChapter B 116.115(c)
                   5C THC Chapter 382, SubChapter A 382.085(b)
Rqmt Prov:         PERMIT IA
Description:       Failure to operated without visible liquid leaks or spills.

Dat  02/28/2003    (194836)
Self        YES                                  Classification:      Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)

TWC Chapter 26 26.121(a)[G]

Description:          Failure to meet the limit for one or more permit parameter

Dat   06/30/2004      (358407)

Self            YES                                    Classification;      Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
                   TWC Chapter 26 26.121(a)[G]

Description:          Failure to meet the limit for one or more permit parameter

Dat   12/17/2004      (290794)

Self            NO                                     Classification:      Moderate
Citation:          30 TAC Chapter 116, SubChapter B 116.115(b)(2)(F)
                   5C THC Chapter 382, SubChapter A 382.085(b)
Rqmt Prov:      PERMIT IA
Description:          The company failed to prevent benzene from spilling on top of the floating roof tank during a
                   railcar unloading operation.

Dat   11/30/2004      (358412)

Self            YES                                    Classification:      Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
                   TWC Chapter 26 26.121(a)[G]

Description:          Failure to meet the limit for one or more permit parameter

Dat   07/31/2002      (194856)

Self            YES                                    Classification:      Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
                   TWC Chapter 26 26.121(a)[G]

Description:          Failure to meet the limit for one or more permit parameter

Dat   02/08/2002      (79314)

Self            NO                                     Classification:      Moderate
Citation:          30 TAC Chapter 101, SubChapter A 101.20(1)
Description:          MONITORING REQ
Self            NO                                     Classification:      Moderate
Citation:          30 TAC Chapter 116, SubChapter B 116.115(c)
Rqmt Prov:      OP IA
Description:          Failure to Comply
Self            NO                                     Classification:      Moderate
Citation:          30 TAC Chapter 101, SubChapter A 101.20(2)
Description:          MONITORING REQ

Dat   08/31/2002      (194859)

Self            YES                                    Classification:      Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
                   TWC Chapter 26 26.121(a)[G]

Description:          Failure to meet the limit for one or more permit parameter

Dat   03/31/2005      (423378)

Self            YES                                    Classification:      Moderate
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
                   TWC Chapter 26 26.121(a)[G]

Description:          Failure to meet the limit for one or more permit parameter

Dat   03/29/2006      (454492)

Self            NO                                     Classification:      Minor
Citation:          30 TAC Chapter 305, SubChapter F 305.125(1)
Description:          Failure to maintain compliance with the permit effluent limits for biochemical oxygen demand
                   (BOD5).
Self            NO                                     Classification:      Moderate
Citation:          30 TAC Chapter 335, SubChapter A 335.4(1)
Description:          Failure to adequately manage solid waste.

F.     Environmental audits.
       Notice of Intent Date:    10/23/2001      (35662)
          Disclosure Date:       5/7/2002  12:00:00 AM
       Viol. Classification:     Moderate
          Citation:       30 TAC Chapter 116, SubChapter B

Rqmt           PERMIT  SC 3A
Description:      Failure to maintain VOC aggregate partial pressure or vapor pressure at permitted levelS OF 0.044 psia at 68 degree F.

Notice of Intent Date:     04/27/2006          (466867)
          No DOV Associated

G.     Type of environmental management systems (EMSs).

          N/A

H.     Voluntary on-site compliance assessment dates.

          N/A

I.     Participation in a voluntary pollution reduction program.

          N/A

J.     Early compliance.

          N/A

Sites Outside of Texas

          N/A

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY



| | | |
|---|---|---|
| **IN THE MATTER OF AN** | § | **BEFORE THE** |
| **ENFORCEMENT ACTION** | § | |
| **CONCERNING** | § | **TEXAS COMMISSION ON** |
| **INTERCONTINENTAL TERMINALS** | § | |
| **COMPANY** | § | **ENVIRONMENTAL QUALITY** |
| **RN100210806** | | |

## AGREED ORDER
### DOCKET NO. 2006-1017-AIR-E

### I. JURISDICTION AND STIPULATIONS

At its _____ agenda, the Texas Commission on Environmental Quality ("the Commission" or "TCEQ") considered this agreement of the parties, resolving an enforcement action regarding Intercontinental Terminals Company ("ITC") under the authority of TEX. HEALTH & SAFETY CODE ch. 382 and TEX. WATER CODE ch. 7. The Executive Director of the TCEQ, through the Enforcement Division, and ITC appear before the Commission and together stipulate that:

1. ITC owns and operates a multi-product bulk liquid storage and distribution terminal at 1943 Battleground Road in La Porte, Harris County, Texas (the "Plant").

2. The Plant consists of one or more sources as defined in TEX. HEALTH & SAFETY CODE § 382.003(12).

3. The Commission and ITC agree that the Commission has jurisdiction to enter this Agreed Order, and that ITC is subject to the Commission's jurisdiction.

4. ITC received notice of the violations alleged in Section II ("Allegations") on or about July 10, 2006.

5. The occurrence of any violation is in dispute and the entry of this Agreed Order shall not constitute an admission by ITC of any violation alleged in Section II ("Allegations"), nor of any statute or rule.

6. An administrative penalty in the amount of Nine Thousand Five Hundred Dollars ($9,500) is assessed by the Commission in settlement of the violations alleged in Section II ("Allegations"). ITC has paid Seven Thousand Six Hundred Dollars ($7,600) of the administrative penalty and One Thousand Nine Hundred Dollars ($1,900) is deferred contingent upon ITC's timely and satisfactory compliance with all the terms of this Agreed Order. The deferred amount will be waived upon full compliance with the terms of this Agreed Order. If ITC fails to timely and satisfactorily comply with all requirements of this Agreed Order, the Executive Director may require ITC to pay all or part of the deferred penalty.

Intercontinental Terminals Company
DOCKET NO. 2006-1017-AIR-E
Page 2

7.   Any notice and procedures which might otherwise be authorized or required in this action are waived in the interest of a more timely resolution of the matter.

8.   The Executive Director of the TCEQ and ITC have agreed on a settlement of the matters alleged in this enforcement action, subject to the approval of the Commission.

9.   The Executive Director may, without further notice or hearing, refer this matter to the Office of the Attorney General of the State of Texas ("OAG") for further enforcement proceedings if the Executive Director determines that ITC has not complied with one or more of the terms or conditions in this Agreed Order.

10.  This Agreed Order shall terminate five years from its effective date or upon compliance with all the terms and conditions set forth in this Agreed Order, whichever is later.

11.  The provisions of this Agreed Order are deemed severable and, if a court of competent jurisdiction or other appropriate authority deems any provision of this Agreed Order unenforceable, the remaining provisions shall be valid and enforceable.

## II. ALLEGATIONS

As owner and operator of the Plant, ITC is alleged to have failed to prevent unauthorized emissions and to route all emissions from Storage Tank 50-2 to the TK 50-2 Flare, emissions point number ("EPN") FL-50-2 (Incident 71787), in violation of 30 TEX. ADMIN. CODE § 116.115(c), Air Permit No. 1078, Special Conditions 5 and 14 and TEX. HEALTH & SAFETY CODE § 382.085(b), as documented during a record review conducted on April 20, 2006. Specifically, 3,425 pounds of the hazardous air pollutant and highly reactive volatile organic compound 1,3-butadiene were released from the Tank 50-2 Emergency Atmospheric relief valve, EPN TANK 50-2 PSV A, during an emissions event which occurred on February 15, 2006 and lasted 4 minutes. These emissions are not authorized by the permit. Since the emissions event was avoidable, Intercontinental Terminals Company failed to meet the demonstration criteria for an affirmative defense in 30 TEX. ADMIN. CODE § 101.222.

## III. DENIALS

ITC generally denies each allegation in Section II ("Allegations").

## IV. ORDERING PROVISIONS

1.   It is, therefore, ordered by the TCEQ that ITC pay an administrative penalty as set forth in Section I, Paragraph 6 above. The payment of this administrative penalty and ITC's compliance with all the terms and conditions set forth in this Agreed Order resolve only the allegations in Section II. The Commission shall not be constrained in any manner from requiring corrective action or penalties for violations which are not raised here. Administrative penalty payments shall be made payable to

Intercontinental Terminals Company
DOCKET NO. 2006-1017-AIR-E
Page 3

"TCEQ" and shall be sent with the notation "Re: Intercontinental Terminals Company, Docket No. 2006-1017-AIR-E" to:

> Financial Administration Division, Revenues Section
> Attention: Cashier's Office, MC 214
> Texas Commission on Environmental Quality
> P.O. Box 13088
> Austin, Texas 78711-3088

2.  It is further ordered that ITC shall undertake the following technical requirements:

    a.  Within 30 days after the effective date of this Agreed Order, implement measures designed to prevent unauthorized emissions due to the same cause; and

    b.  Within 45 days after the effective date of this Agreed Order, submit written certification to demonstrate compliance with Ordering Provision 2.a. as described below:

    The certification shall be notarized by a State of Texas Notary Public and include the following certification language:

    "I certify under penalty of law that I have personally examined and am familiar with the information submitted and all attached documents, and that based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the submitted information is true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

    The certification shall be submitted to:

    > Order Compliance Team
    > Enforcement Division, MC 149A
    > Texas Commission on Environmental Quality
    > P.O. Box 13087
    > Austin, Texas 78711-3087

    with a copy to:

    > Manager, Air Section
    > Houston Regional Office
    > Texas Commission on Environmental Quality
    > 5425 Polk Avenue, Suite H
    > Houston, Texas 77023-1486

3.  The provisions of this Agreed Order shall apply to and be binding upon ITC. ITC is ordered to give notice of the Agreed Order to personnel who maintain day-to-day control over the Plant operations referenced in this Agreed Order.

Intercontinental Terminals Company
DOCKET NO. 2006-1017-AIR-E
Page 4

4.    If ITC fails to comply with any of the Ordering Provisions in this Agreed Order within the prescribed
schedules, and that failure is caused solely by an act of God, war, strike, riot, or other catastrophe,
ITC's failure to comply is not a violation of this Agreed Order. ITC shall have the burden of
establishing to the Executive Director's satisfaction that such an event has occurred. ITC shall notify
the Executive Director within seven days after ITC becomes aware of a delaying event and shall take
all reasonable measures to mitigate and minimize any delay.

5.    The Executive Director may grant an extension of any deadline in this Agreed Order or in any plan,
report, or other document submitted pursuant to this Agreed Order, upon a written and substantiated
showing of good cause. All requests for extensions by ITC shall be made in writing to the Executive
Director. Extensions are not effective until ITC receives written approval from the Executive
Director. The determination of what constitutes good cause rests solely with the Executive Director.

6.    This Agreed Order, issued by the Commission, shall not be admissible against ITC in a civil
proceeding, unless the proceeding is brought by the OAG to: (1) enforce the terms of this Agreed
Order; or (2) pursue violations of a statute within the Commission's jurisdiction, or of a rule adopted
or an order or permit issued by the Commission under such a statute.

7.    This agreement may be executed in multiple counterparts, which together shall constitute a single
original instrument. Any executed signature page to this Agreement may be transmitted by facsimile
transmission to the other parties, which shall constitute an original signature for all purposes.

8.    Under 30 TEX. ADMIN. CODE § 70.10(b), the effective date is the date of hand-delivery of the Order
to ITC, or three days after the date on which the Commission mails notice of the Order to ITC,
whichever is earlier. The Chief Clerk shall provide a copy of this Agreed Order to each of the
parties.

Intercontinental Terminals Company
DOCKET NO. 2006-1017-AIR-E
Page 5

# SIGNATURE PAGE

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

For the Commission

For the Executive Director                    Date  2/9/07

I, the undersigned, have read and understand the attached Agreed Order. I am authorized to agree to the attached Agreed Order on behalf of the entity, if any, indicated below my signature, and I do agree to the terms and conditions specified therein. I further acknowledge that the TCEQ, in accepting payment for the penalty amount, is materially relying on such representation.

I also understand that my failure to comply with the Ordering Provisions, if any, in this order and/or my failure to timely pay the penalty amount, may result in:

- A negative impact on my compliance history;
- Greater scrutiny of any permit applications submitted by me;
- Referral of this case to the Attorney General's Office for contempt, injunctive relief, additional penalties, and/or attorney fees, or to a collection agency;
- Increased penalties in any future enforcement actions against me;
- Automatic referral to the Attorney General's Office of any future enforcement actions against me; and
- TCEQ seeking other relief as authorized by law.

In addition, any falsification of any compliance documents may result in criminal prosecution.

Signature                                    Date  9/27/06

Name (Printed or typed)  R.L. COMMANDER        Title  Se. Vice President - Operations
Authorized Representative of
Intercontinental Terminals Company

Instructions: Send the original, signed Agreed Order with penalty payment to the Financial Administration Division, Revenues Section at the address in Section IV, Paragraph 1 of this Agreed Order.

2019-86194 / Court: 133

# EXHIBIT 2



The Office of Vince Ryan
County Attorney

April 23, 2010

Texas Commission on Environmental Quality          VIA     Regular US Mail
Central Office                                              Certified Mail RRR
P.O. Box 13087                                             FAX: 512-239-2550
Austin, Texas 78711-3087

ATTN: Enforcement Coordinator Miriam Hall

 RE: Comments on Proposed Settlement of Intercontinental Terminals Company, L.L.C. DOCKET NUMBER RN100210806 LOCATION: La Porte, Harris County, TYPE OF FACILITY: bulk liquid storage terminal; RULE VIOLATED: 30 TAC 116.115(c), Permit Number 1078, SC Number 5 and THSC §382.085(b) by failing to prevent overloading of a railcar; PENALTY $10,000: Enforcement Coordinator Miriam Hall (512)-239-1044; REGIONAL OFFICE: 5425 Polk Avenue, Houston, Texas 77023-1452, 713-767-3500 published in 35 TexReg 2643; March 26, 2010.

Dear Commissioners and Ms. Hall;

 On September 19, 2009 at 9:50 a.m., personnel from the Harris County Public Health & Environmental Services Department, Environmental Public Health Division, were called to the Intercontinental Terminals Company (ITC) facility located at 1943 Independence Parkway South (formerly Battleground Road) in LaPorte, Texas (Precinct 2) to conduct an investigation of a report of an unauthorized release of more than 8,955 lbs toluene onto the ground and into the storm drains in the area, and 1,452 lbs of toluene into the air as the result of overloading a rail car. ITC owns and operates the facility located at 1943 Independence parkway south in LaPorte, Texas. Previously Harris County sued ITC for a number of violations that resulted in releases and spills at their facility. That case was settled and an agreed final judgment and permanent injunction

was entered as a result, requiring ITC to use its best efforts to avoid future violations. Harris County believes the most recent violations breach that agreement.

In addition, ITC has had numerous violations over the years at the facility in question that have been attributed to operator error and that have resulted in the release of toxic chemicals into the environment. Specifically, on no fewer than six occasions since 2007, Harris County and/or the TCEQ have investigated violations that involved significant amounts of benzene, toluene and 1,3 butadiene.

By way of the settlement referenced above, under the provisions of Texas Water Code Section 7, Subchapter C, the Texas Commission on Environmental Quality proposes to settle claims for violations of 30 TAC 116.115(c), Permit Number 1078, Standard Condition Number 5 and THSC §382.085(b) which were also raised by Harris County in its lawsuit filed on March 16, 2010 in Cause No. 2010-16782 in the 125th (Transferred to the 157th) Court of Harris County, Texas pertaining to the huge chemical spill for violations 30 TAC 116.115(c), Permit Number 1078, Standard Condition Number 5 and THSC §382.085(b) cause by failing to prevent overloading of a railcar.

Harris County asserts that the proposed settlement is not in the best interests of the residents and citizens of the State of Texas and Harris County for the following reasons:

1. The proposed administrative penalty of $10,000.00 is not appropriate with respect to the violations committed by the company. Intercontinental Terminals has had other serious releases since 2007 and as a repeat violator should not be offered such a low "cost of doing business" penalty.

2.    The proposed penalty is only 1/3 of the maximum penalty that could be assessed for three violations and the agency has failed to cite all of the violations that occurred and has failed to speciate those that did occur. These failures have resulted in a "low ball" settlement number and to make matters worse the proposed order would defer $2,000.00 of the penalty to insure compliance with requirements that have already taken place.

3.    The proposed settlement does not include any penalty for the serious Water Code violation that occurred when the 8,955 lbs toluene spilled onto the ground and entered into a storm drain and then into the Tidal Road, roadside ditch.

4.    The proposed corrective measures are inadequate

a.   On January 18, 2009, installed a surveillance camera at the Track D and E Rail Loading Area to give key personnel the opportunity to view all loading spots 24 hours a day because this does not address best management practices that would include the installation of devices that could detect and prevent overfilling and it occurred before any threat of enforcement existed, in other words, there is no reason to believe this action was undertaken as a result of the incident in question.

b.   By January 22, 2009, revised the Railroad Loading Checklists, operator qualification exams, and operating procedures and conducted operator training on the new procedures and checklists. This

operational change does not address best management practices as would the installation of devices that could detect and prevent overfilling. This operational change also, occurred before any threat of enforcement existed, in other words, there no reason to believe this action was undertaken as a result of the incident in question.

5.    The proposed settlement does not compensate Harris County for the resources it expended in its investigation and enforcement efforts and can the State of Texas is precluded from recovering these costs in an Administrative Order as provided by the Texas Water Code. The Texas Legislature saw fit to make possible the recovery of investigative costs incurred by local and state entities and a provision requiring such should be a part of every administrative settlement.

6.    The Texas Commission on Environmental Quality's Administrative Penalty policy and practices is not being used to conserve the natural resources of the sate and to protect the environment as it is required to do by declaration of policy. Damage to the environment in Harris County is not deterred by a penalty policy that is looked upon as "a cost of doing business" by industry and if this settlement is allowed to become final it may be argued that it precludes Harris County from seeking additional injunctive relief or from receiving any compensation for the damaged caused to the local environment.

7.    Past violations and the conditions surrounding this incident do not warrant a provision in the settlement proposal that allows the company

to escape an admission of liability. Considering the low penalty and the inadequate remedial provisions, there is insufficient consideration for "no admission of liability" clause in the language of the proposed settlement.

For the reasons expressed above, Harris County and the Harris County Attorney respectfully request the Commission reject the proposed settlement.

Please present and act on these comments in accordance with Chapter 7 of the TWC § 7.075(b) in the due course of the business of your agency.  If you have any questions concerning our comments, please contact the undersigned.

Respectfully submitted

VINCE RYAN
Harris County Attorney

By Rock Owens
Chief, Environmental Division

2019-86194 / Court: 133

# EXHIBIT 3

November 4, 2006

Hayden & Cunningham, PLLC
Attn:   Donald T. Brennan
7750 Broadway
San Antonio, Texas 78209

Re:      Your File No. 5957-069
         Claims of ALAMO ENVIRONMENTAL, Inc. against Vaquero Pipeline Company

Dear Mr. Brennan:

This will confirm receipt of your letter of November 1, 2006 regarding the claim above and your
notice of a potential mechanic's lien resulting from same.  Please be advised that Intercontinental
Terminals Management Company ("ITMC") is not a proper entity in this claim as it is essentially
only a management company that contracts management and consultant services to
Intercontinental Terminals Company ("ITC"), a Texas General Partnership, that operates a bulk
chemical liquid storage facility at Deer Park, Texas.  A such, ITMC does not own any real assets
on which a lien may be placed.   ITC, the terminal operator, functions on property owned by
Mitsui and Co. (USA) ("MITSUI").  I suggest that while future correspondence on the issue at
hand continue to be addressed to me, that you change the party to other than ITMC.

To reaffirm the information I gave you over the phone several weeks ago concerning your claim,
neither ITC nor MITSUI has or had an owner/contractor relationship with Vaquero Pipeline
Company, LP ("VAQUERO").  As such no funds have been paid or are due to VAQUERO.
There are no funds to trap nor to retain available for creditors of VAQUERO under Section
162.001 et .seq. of the Texas Property Code.  VAQUERO is simply a pipeline lessee under an
easement with MITSUI.  The leak of phenol from VAQUERO's pipeline located in the easement
has, in fact, generated ITC's own claim against VAQUERO for the environmental clean-up
costs.  This puts us in sympathy with your client's claim but I believe in no way makes us liable
for your client's claim.

ITC/MITSUI 0001

I am willing to continue our communications in an attempt to get resolution for all the parties in this unfortunate incident, but I believe your reliance on the M&M statutes are unfounded and will be unproductive.  As such I request you cease this course of action against my clients.  If I am missing something here that puts my clients at financial risk from your client, I would appreciate being informed.

Sincerely,


Roderick E. Lide
Attorney at Law

Cc:
Mr. Ronald D Christ
Vice President, Administration
Intercontinental Terminals Company
17 Briar Hollow, Suite 402
Houston, TX  77027

Mr. Anthony A. Guccione
Executive Vice President and General Manager
Intercontinental Terminals Company
17 Briar Hollow, Suite 402
Houston, TX  77027

ITC/MITSUI 0002

2019-86194 / Court: 133

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| *IN RE:* INTERCONTINENTAL TERMINALS COMPANY LLC DEER PARK FIRE LITIGATION | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Lead Case No. 4:19-cv-01460<br><br>Related Case Nos.<br><br>4:19-cv-01424; 4:19-cv-01428;<br>4:19-cv-01430; 4:19-cv-01431;<br>4:19-cv-01433; 4:19-cv-01434;<br>4:19-cv-01436; 4:19-cv-01440;<br>4:19-cv-01443; 4:19-cv-01444;<br>4:19-cv-01447; 4:19-cv-01450;<br>4:19-cv-01452; 4:19-cv-01453;<br>4:19-cv-01457; 4:19-cv-01459;<br>4:19-cv-01461 |
| STATE OF TEXAS<br><br>COUNTY OF HARRIS | §<br>§<br>§ | |

### DECLARATION OF STEPHEN WARREN MILES

1.     My name is Stephen Warren Miles.  I am over 18 years of age, of sound mind, and capable of making this Declaration.  The facts stated in this Declaration are within my personal knowledge and are true and correct.

2.     I have read Plaintiffs' proposed Amended Complaint in the referenced *Munoz* lawsuit and understand that Plaintiffs are attempting to assert a claim against Intercontinental Terminals Management Company, Inc. ("ITMC") in connection with the fire that occurred beginning on March 17, 2019 at the Intercontinental Terminals Company LLC ("ITC") terminal facility in Deer Park, Texas (the "Deer Park Facility").  ITMC has never held an ownership interest in or been involved with the management or operation of the Deer Park Facility.

1

3.      From 1972 through 1996, Stemil, Inc. ("Stemil")—an entity owned by myself and my wife, Marilyn Miles—held a partnership interest in the entity that operated the Deer Park Facility during this time period.

4.      In 1996, Stemil sold its remaining interests in the partnership that then operated the Deer Park Facility.  Since that time, Stemil has held no interest in this partnership, ITC, or the Deer Park Facility.

5.      Thereafter, I entered into a contract to serve as President of ITC from 1996 through 2006.

6.      From approximately 1996 through 2000, I used Stemil for personal financial and retirement purposes.  It had no affiliation with or involvement in the management of ITC or the operation of the Deer Park Facility during this time period.

7.      In or about January 2000, I changed Stemil's name to Intercontinental Terminals Management Company, Inc.  My wife, Marilyn Miles, and I are and have always been the sole shareholders of ITMC.

8.      ITMC has been used since its inception for personal financial and retirement purposes, including the creation of a personal pension fund for myself and my family.

9.      ITMC has never had an ownership interest in ITC or the Deer Park Facility. ITMC has never had any employees or been involved in the management or operation of the Deer Park Facility.

10.     In December 2006, I retired as President of ITC.  Since that time, I have had no personal involvement in the operation or management of ITC or the Deer Park Facility.

I hereby declare under penalty of perjury that the foregoing is true and correct on the date indicated below:

Stephen Warren Miles

Date: 05/31/2019

2019-86194 / Court: 133

# **EXHIBIT 5**

Questions or Comments >>

Customer Search    RE Search    ID Search    Document Search    Search Results    TCEQ Home

Query Name

# CN605446749 Affiliation with RN106119175

## Customer Information

**CN Number:** CN605446749
**Last Update Date:** 12/12/2017
**Name:** INTERCONTINENTAL TERMINALS MANAGEMENT COMPANY    View Prior Names

**Legal Name:** Intercontinental Terminals Management Company
**Customer Type:** CORPORATION

*The Customer Name displayed may be different than the Customer Name associated to the Additional IDs related to the customer. This name may be different due to ownership changes, legal name changes, or other administrative changes.*

## Affiliation Information

**Customer Role(s):** OWNER OPERATOR
**Begin Date:** 12/12/2017
**End Date:**

## Regulated Entity Information

**RN Number:** RN106119175
**Name:** INTERCONTINENTAL TERMINALS PASADENA TERMINAL    View Prior Names
**Primary Business:** BULK LIQUID STORAGE TERMINAL
**Street Address:** 1030 ETHYL ROAD, PASADENA TX 77503
**County:** HARRIS
**Nearest City:** PASADENA
**State:** TX
**Near ZIP Code:** 77503
**Physical Location:** 1030 ETHYL ROAD

## Permits, Registrations, or Other Authorizations

There is **1** program and ID for this regulated entity and customer.

**1-1 of 1 Records**

| Program | ID Type | ID Number | ID Status |
|---------|---------|-----------|-----------|
| ON SITE SEWAGE FACILITY | PERMIT | 1011101 | ACTIVE |

Site Help | Disclaimer | Web Policies | Accessibility | Our Compact with Texans | TCEQ Homeland Security | Contact Us | Central Registry | Search Hints | Report Data Errors
Statewide Links: Texas.gov | Texas Homeland Security | TRAIL Statewide Archive | Texas Veterans Portal

© 2002 - 2019 Texas Commission on Environmental Quality

https://www15.tceq.texas.gov/crpub/index.cfm?fuseaction=affil.showSingleAffil&affil_id=928375572018067    1/1

2019-86194 / Court: 133

# EXHIBIT 6

We, the undersigned natural persons of the age of twenty-one (21) years or more, at least two of whom are citizens of the State of Texas, acting as incorporators of a corporation under the Texas Business Corporation Act, (hereinafter referred to as the "Act"), do hereby adopt the following Articles of Incorporation for such corporation.

### ARTICLE I.

The name of the corporation is STEMIL, INC.

### ARTICLE II.

The period of its duration is perpetual.

### ARTICLE III.

Section 1. The purpose or purposes for which the corporation is organized are:

(a)   To engage in the business of leasing as Lessee, and operating, a storage terminal in Harris County, Texas, and any facilities used or useful in connection therewith or related thereto, and in the business of loading, unloading, packaging, and storing liquids and gases at such terminal or facilities;

(b)   To enter into a partnership with another corporation, which partnership is to engage in the business of leasing as Lessee, and operating, a storage terminal in Harris County, Texas, and any facilities useful or used in connection therewith or related thereto, and in the business of loading, unloading, packaging, and storing liquids and gases at such terminal or facilities, whether or not such partnership involves sharing or delegation, with or to such other corporation, of control over such partnership and businesses;

(c)   To enter into or participate with any other person or persons or corporation or corporations in any partnership

joint venture, or other association and the business or businesses in which such partnership, limited partnership, joint venture or other association may be engaged;

(d) To do everything necessary, advisable, proper or convenient for the accomplishment of any of the purposes herein set forth, and to do all other things incidental to or connected therewith, which are not forbidden by the Act, by other law or by these Articles of Incorporation.

Section 2. <u>Direction of Purposes and Exercise of Powers by Directors.</u> Subject to any limitations or restrictions imposed by the Act, by other law, or by these Articles of Incorporation, the Board of Directors is hereby authorized to direct the purposes set forth in this Article of these Articles of Incorporation and to exercise all the powers of the corporation, without previous authorization or subsequent approval by the shareholders; and all parties dealing with the corporation shall have the right to rely on any action taken by the corporation pursuant to such action by the Board of Directors.

ARTICLE IV.

The aggregate number of shares which the corporation shall have authority to issue is One Hundred Thousand (100,000) of the par value of One Dollar ($1.00) each.

ARTICLE V.

The corporation will not commence business until there is received for the issuance of its shares consideration of the value of One Thousand Dollars ($1,000.00), consisting of money, labor done or property actually delivered.

-2-

Harris County, Texas, 77002, and the name of its initial registered agent at such address is John J. Feldt.

## ARTICLE VII.

The number of directors constituting the initial Board of Directors is Three (3), and the names and addresses of the persons who are to serve as Directors until the first annual meeting of shareholders, or until their respective successors are elected and qualified, are:

| STEPHEN W. MILES | 211 Briar Hill<br>Houston, Texas   77042 |
| MARILYN R. MILES | 211 Briar Hill<br>Houston, Texas   77042 |
| JOSEPH P. MAHONEY | 104 S. Randall Court<br>Gretna, Louisiana   70053 |

The right to cumulative voting in the election of Directors is expressly prohibited.

## ARTICLE VIII.

The name and addresses of the incorporators are:

| CARLYLE W. URBAN | 606 Houston First Savings Bldg.<br>Houston, Texas   77002 |
| JOHN J. FELDT | 606 Houston First Savings Bldg.<br>Houston, Texas   77002 |
| JOEL B. COOLIDGE | 606 Houston First Savings Bldg.<br>Houston, Texas   77002 |

## ARTICLE IX.

The Board of Directors of this corporation is expressly authorized to alter, amend, or repeal the By-Laws or to adopt new By-Laws of

-3-

ARTICLE X.

Any person who is a Director or officer, or former Director or officer of the corporation, or any person who may have served at its request as a Director or officer of another corporation in which it owns shares of capital stock, or of which it is a creditor, shall be indemnified against expenses actually and necessarily incurred by him in connection with the defense of any action, suit or proceeding in which he is made a party by reason of being, or having been, such Director or officer, except in relation to matters as to which he shall be adjudged in such action, suit or proceeding to be liable for negligence or misconduct in the performance of duty, but such indemnification shall not be deemed exclusive of any other right to which such Director or officer may be entitled, under any By-Law Agreement, vote of shareholders or otherwise.

IN WITNESS WHEREOF, we have hereto set our hands this 3rd day of February , A.D., 1972.

_____
CARLYLE W. URBAN

_____
JOHN J. FELDT

_____
JOEL R. COOLIDGE

-4-

this _____ day of _____, 19___, personally appeared before me, CARLYLE W. URBAN, JOHN J. FELDT, and JOEL B. COOLIDGE, who, each being by me first duly sworn, declared that they are the persons who signed the foregoing document as Incorporators, and that the statements contained therein are true.

Notary Public in and for Harris County,
Texas

2019-86194 / Court: 133

**EXHIBIT 7**

CAUSE NO. 2006-75336

| ALAMO ENVIRONMENTAL, INC. | § | IN THE DISTRICT COURT |
| D/B/A ALAMO1 | § | |
| | § | |
| VS. | § | 157th JUDICIAL DISTRICT |
| | § | |
| VAQUERO PIPELINE COMPANY, L.P., | § | |
| VAQUERO PIPELINE COMPANY 1, | § | |
| L.L.C., INTERCONTINENTAL | § | |
| TERMINALS MANAGEMENT | § | |
| COMPANY AND MITSUI & CO. (U.S.A.), | § | |
| INC. | § | HARRIS COUNTY, TEXAS |

### AFFIDAVIT OF ALEX SALAS

Before me the undersigned notary public personally appeared Alex Salas who after being duly sworn and deposed stated under oath: my name is Alex Salas, I am over the age of 18, of sound mind, competent to make this affidavit and every statement contained herein is true, correct and within my personal knowledge.

1.  I am the President of Alamo Environmental, Inc. d/b/a Alamo1. Alamo1 is a Texas corporation which provides services as a full service contractor that specializes in industrial construction, demolition, remediation, abatement, technical services, waste transportation, emergency response, recycling, health and safety compliance.

2.  In June 2006 , Alamo1 responded to a phenol spill which resulted form a pipeline breakage within a 12" easement leased by Vaquero but extended well beyond the easement to property owned by Mitsui and managed by ITMC. The property where the response was done is described generally as 2700 Tidal Road, La Port, Texas 77571, Harris County, Texas. The property is described legally as:

    THE FOLLOWING IS A CENTERLINE DESCRIPTION OF A PROPOSED TWELVE INCH (12") PHENOL PIPELINE EXTENDING OVER, THROUGH, ALONG AND ACROSS THE RESIDUE OF 98.6698 ACRES OF LAND SITUATED IN GEORGE ROSS SURVEY A-646, HARRIS COUNTY, TEXAS, MORE PARTICULARLY DESCRIBED IN SPECIAL WARRANTY DEED FROM FLUOR CONSTRUCTORS, INC. TO MITSUI & CO. (U.S.A.), INC., RECORDED UNDER COUNTY COURT'S FILE NUMBER H826946, (FILM CODE 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) OFFICIAL PUBLIC

1

RECORDS OF REAL PROPERTY, HARRIS COUNTY, TEXAS AND THE RESIDUE OF 85.3667 ACRES OF LAND SITUATED IN THE GEORGE ROSS SURVEY, A-646, HARRIS COUNTY, TEXAS, MORE PARTICULARLY DESCRIBED IN CORRECTION WARRANTY DEED FROM ROLLINS PROPERTIES, INC. TO MITSUI & CO. (U.S.A.), INC. RECORDED UNDER COUNTY CLERK FILE NUMBER E892213 (FILM CODE 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), OFFICIAL PUBLIC RECORDS OF REAL PROPERTY, HARRIS COUNTY, TEXAS WITH A MEADS AND BOUNCE DESCRIPTION ATTACHED HERETO AS EXHIBIT "A".

3.   Intercontinental Terminals Management Co. operates the facility and land owned by Mitsui as described above for hire bulk liquid storage facility that stores a variety of chemicals and petro chemicals. Defendant, Intercontinental Terminals Management Co. is an agent of Mitsui & Co. (U.S.A.), Inc. wherein they provided for Mitsui among other things a systematic, proactive approach to prevention of accidental releases of hazardous chemicals. Their system includes but is not limited to the following:

a.   A process hazard analysis;
b.   Operating procedure;
c.   Training;
d.   Management of Claim;
e.   Prestart up review;
f.   Compliance audit; and
g.   Accident investigation.

4.   Defendants, Vaquero Pipeline Company, L.P. and Vaquero Pipeline Company 1, LLC (hereinafter referred to as Vaquero) is the pipeline lessee under an easement with Defendant Mitsui which is attached hereto as Exhibit "B". Thus, Vaquero leases the pipeline and is managed and over seen by ITMC on land owned by Mitsui.

5.   Phenol spills pose a severe health hazard and need to be handled with extreme caution. Phenol is highly corrosive to the skin and readily absorb through it, where upon it can affect the central nervous system and cause damage to the liver and kidneys. When heated, phenol will produce flammable vapors that are highly toxic (just a few parts per million and explosive) at concentrations of three percent to ten percent in air.

6.   The remediation required of the surrounding soil which resulted from the phenol spill was substantial and went from June 2006 through November 2006. It required 24 hour a day watch and monitoring. Over $437,111.51 was spent

in disposal charges. They include incineration charges of $146,703.43 as seen in Invoice No. AH06155X1 and $186,524.48 in incineration charges as demonstrated in Invoice No. AH-06-155X3. Additionally, there is burial disposal of $25,035.48 as seen in Invoice No. AH06-155X and another $9,203.22 of burial disposal charges as seen in Invoice No. AH06-155X5. Finally, there was liquid disposal of $36,436.40 as seen in Invoice No. AH06-155X1 and an additional $33,208.50 as seen in Invoice No. AH06-155X3. Labor charges totaled $236,231.25 through September 2006 with an additional $248,119.98 in subcontractor charges from October 2006 through November 2006. Additionally, Alamo spent $161,436.25 in equipment charges. The total charges as seen on the chart attached hereto incurred by Alamo are $1,127,833.99. This includes several thousand tons of soil actually removed, disposed of and/or remediated not just in the area covered by the easement leased by Vaquero but on a ½ to 1 acre area of land actually owned by Mitsui, not subject to the lease. It was agents of Mitsui and in particular employees of Defendant, ITMC which directed every aspect of the remediation in this case. In particular, Gary Carroll, Carl Holly and individual Max, all employees of ITMC directed and controlled entrance and exit to the facilities. They further provided what material was to be removed and what depths and lengths the material was to be removed. This was all on Mitsui's land and it was Mitsui's land and not just the area of the pipeline easement which was improved. It was clear to all parties involved that Vaquero and ITMC were authorized agents of Mitsui regarding the work Alamo1 performed.

7.   As seen in the attachments, Alamo billed Vaquero each month work was performed. Alamo further provided notices to ITMC as well as Mitsui of these unpaid amounts for valuable remediation work which they knew they were receiving and which they specially requested from Alamo.

8.   Alamo timely filed Mechanic's Liens and sent notices to Mitsui and ITMC in accordance with the Texas Property Code. The Mechanic's Lien included the following:

   1.   A sworn statement of the amount claimed;
   2.   The name and last known address of the owner or reputed owner;
   3.   A general statement of the kind of work done and materials furnished by the Claimant, even though not necessary as Plaintiff was an original contractor a statement of each month in which the work was performed and materials furnished for which payment was requested;
   4.   The name and last known address of the person by whom the Claimant was employed or to whom the Claimant furnished the materials or labor;

5.      The name and last known address of the original contractor, even though it was Plaintiff;

6.      A description legally sufficient for the identification, of the property sought to be charged with the lien;

7.      The Claimant's name, mailing address and physical address;

8.      A statement identifying the date each notice of the claim was sent to the owner and the method in which it was sent.

9.      As seen in Exhibit "A" in VAQUERO's Motion for Summary Judgment, the Plaintiff and VAQUERO entered into a written contract on July 5, 2006 entitled General Services Agreement.  This agreement clearly spelled out the duties and obligations of the parties.  In particular, it provided that all work would be invoiced in accordance with the written proposal.  That VAQUERO agreed to pay on a time and material basis in accordance with the written schedule rate attached to the contract.  That VAQUERO was responsible for the work site and the site was suitable for the size and weight of all the vehicles and equipment employed by ALAMO.  VAQUERO further agreed to pay each invoice within 30 days.  VAQUERO further agreed in writing to pay one in a half times the hourly rate for non-standardized hours.  It is clear from the fraud audit attached to VAQUERO's Motion for Summary Judgment that they never intended to perform under the written contract.  For example, VAQUERO unilaterally took the following actions after ALAMO performed under the contract in direct violation of the expressed written terms:

1.      Changed the daily rental rate as stated within the contract to a monthly rate which they made up;

2.      Changed the amount of the equipment rental as stated in the contract from a daily rental rate to a monthly rental rate which again they made up;

3.      Refused to pay ALAMO's employees non-standard hour rates which it agreed to under the contract for working evening shifts and/or weekends;

4.      Changed unilaterally the hourly rate professionals were working; and

5.      Made compliance with the ITC's sign-in sheet a requirement for employees to be paid.

None of these items listed above are part of the written agreement and are directly contrary to the parties agreement.  Additionally, VAQUERO has still

refused to pay for over $400,000.00 in land fills/manifest charges that ALAMO has already paid to third parties.

ALAMO relied on VAQUERO living up to the written agreement when it priced, bid, and entered into the contract made the basis of this lawsuit. Had ALAMO known that VAQUERO would only pay for rates it determined in its own discretion to be reasonable and in accordance with their other requirements as set forth above, ALAMO would have never entered into the contract made the basis of this lawsuit. Thus, ALAMO asserts that VAQUERO engaged in fraud in the above referenced transaction.

Further Affiant sayeth not.

ALEX SALAS

SUBSCRIBED AND SWORN TO BEFORE ME by the said ALEX SALAS on this the _5th_ day of January, 2009, to certify which witness my hand and seal of office.

IDA VINCENT
NOTARY PUBLIC
State of Texas
Comm. Exp. 08-09-2012

Notary Public, State of Texas

2019-86194 / Court: 133

# EXHIBIT 8

CAUSE NO. 2006-75336

| | | |
|---|---|---|
| ALAMO ENVIRONMENTAL, INC. | § | IN THE DISTRICT COURT |
| D/B/A ALAMO1 | § | |
| | § | |
| VS. | § | 157th JUDICIAL DISTRICT |
| | § | |
| VAQUERO PIPELINE COMPANY, L.P., | § | |
| VAQUERO PIPELINE COMPANY 1, | § | |
| L.L.C., INTERCONTINENTAL | § | |
| TERMINALS MANAGEMENT | § | |
| COMPANY AND MITSUI & CO. (U.S.A.), | § | |
| INC. | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT OF MICHAEL E. EDMONDSON

Before me the undersigned notary public personally appeared Michael E. Edmondson who after being duly sworn and deposed stated under oath: my name is Michael E. Edmondson. I am over the age of 18, of sound mind, competent to make this affidavit and every statement contained herein is true, correct and within my personal knowledge.

1.     I was hired by Vaquero Pipeline Company, L.P. as an independent broker for purposes of disposing and/or recycling hazardous and non-hazardous waste material generated by a phenol spill which resulted from a pipeline breakage within a 12' easement leased by Vaquero but extended way beyond the easement to property owned by Mitsui and managed by ITMC. The property is described generally as 2700 Tidal Rd., La Port, Texas 77571, Harris County, Texas. The property is described legally:

THE FOLLOWING IS A CENTERLINE DESCRIPTION OF A PROPOSED TWELVE INCH (12") PHENOL PIPELINE EXTENDING OVER, THROUGH, ALONG AND ACROSS THE RESIDUE OF 98.6698 ACRES OF LAND SITUATED IN GEORGE ROSS SURVEY A-646, HARRIS COUNTY, TEXAS, MORE PARTICULARLY DESCRIBED IN SPECIAL WARRANTY DEED FROM FLUOR CONSTRUCTORS, INC. TO MITSUI & CO. (U.S.A.), INC., RECORDED UNDER COUNTY COURT'S FILE NUMBER H826946, (FILM CODE 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) OFFICIAL PUBLIC RECORDS OF REAL PROPERTY, HARRIS COUNTY, TEXAS AND THE RESIDUE OF 85.3667 ACRES OF LAND SITUATED IN THE GEORGE ROSS SURVEY, A-646, HARRIS COUNTY, TEXAS. MORE PARTICULARLY DESCRIBED IN CORRECTION WARRANTY DEED FROM ROLLINS PROPERTIES, INC. TO MITSUI & CO. (U.S.A.), INC.

Unofficial Copy Office of Chris Daniel District Clerk

RECORDED UNDER COUNTY CLERK FILE NUMBER E892213 (FILM CODE 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), OFFICIAL PUBLIC RECORDS OF REAL PROPERTY, HARRIS COUNTY, TEXAS WITH A MEADS AND BOUNCE DESCRIPTION ATTACHED HERETO AS EXHIBIT "A".

2.    Intercontinental Terminals Management Co. operates the facility and land owned by Mitsui as described above for hire bulk liquid storage facility that stores a variety of chemicals and petro chemicals. Defendant, Intercontinental Terminals Management Co. is an agent of Mitsui & Co. (U.S.A.), Inc. wherein they provided for Mitsui among other things a systematic, proactive approach to prevention of accidental releases of hazardous chemicals. Their system includes but is not limited to the following:

    a.    A process hazard analysis;
    b.    Operating procedure;
    c.    Training;
    d.    Management of Claim;
    e.    Prestart up review;
    f.    Compliance audit; and
    g.    Accident investigation.

3.    Defendants, Vaquero Pipeline Company, L.P. and Vaquero Pipeline Company 1, LLC (hereinafter referred to as Vaquero) is the pipeline lessee under an easement with Defendant Mitsui which is attached hereto as Exhibit "B". Thus, Vaquero leases the pipeline and is managed and over seen by ITMC on land owned by Mitsui.

4.    I was permitted to act as an authorized agent following the June 2006 phenol spill for the following purposes:

    a.    Authorizing amendments to material profile sheets;
    b.    Signing certifications necessary to comply with the disposal and/or recyclers requirements;
    c.    Signing certifications and/or notices for compliance with land ban restrictions;
    d.    Signing waste manifest to initiate shipments to disposal and recycle facilities; and
    e.    Signing profiles and contracts to dispose and/or transport materials.

5.    Phenol spills pose a severe health hazard and need to be handled with extreme caution. Phenol is highly corrosive to the skin and readily absorb through it, where upon it can affect the central nervous system and cause damage to the

2

liver and kidneys. When heated, phenol will produce flammable vapors that are highly toxic (just a few parts per million and explosive) at concentrations of three percent to ten percent in air.

6.  I personally oversaw the remediation required of the surrounding soil which resulted from the phenol spill performed by Alamo from June 2006 through November 2006.

7.  The work performed by Alamo included but was not limited to removing, disposing and remediating several thousand tons of soil not just in the area covered by the 12" easement leased by Vaquero but on a half to 1 acre area of land actually owned by Mitsui not the subject of the lease. It was agents of Mitsui and in particular employees of Defendant ITMC which directed substantial aspects of the remediation in this case. In particular, Gary Carroll, Carl Holly and an individual named Max, all employees of ITMC directed and controlled entrance and exit to the facilities. The pipeline easement and enjoining areas affected by the spill/releases were required to be remediated in accordance with the requirements set forth in the TCEQ Spill Rules (30 TAC 327). ITMC receives and reviewed all laboratory an analytical data results from sampling activities performed to delineate the extent of contamination within the pipeline easement and enjoining areas. ITMC required Alamo to submit a specific site health and safety plan, submit proof of insurance naming ITMC, implementation of area monitoring plan and a 24 hour/7 day a week site safety/monitoring plan.  ITMC's staff, representatives and environmental consultants were involved daily with work activities with respect to receiving information as well as on site attendant representation during sampling events. This was all on Mitsui's land and it was Mitsui's land and not just the area of the pipeline easement which was improved. Additionally, during the remediation process there were subsequent discharges of phenol and rains which contaminated other areas not originally the subject of the remediation at the direction of Mitsui and ITMC on Mitsui's land. Vaquero and ITMC acted as authorized agents of Mitsui during this project which I witnessed as an independent broker actually hired by Vaquero.

Further Affiant sayeth not.

MICKY EDMONDSON

3

SUBSCRIBED AND SWORN TO BEFORE ME by the said MICKY EDMONDSON on this the 9th day of June, 2008, to certify which witness my hand and seal of office.

GEORGETTE LUCADO
My Commission Expires
August 15, 2011

Notary Public, State of Texas

Unofficial Copy Office of Marilyn Burgess District Clerk

2019-86194 / Court: 133

# EXHIBIT 9

CAUSE NO. 2006-75336

ALAMO ENVIRONMENTAL, INC.   §          **IN THE DISTRICT COURT**
D/B/A ALAMO1   §
                 §
VS.   §        157th JUDICIAL DISTRICT
                 §
VAQUERO PIPELINE COMPANY, L.P.,   §
VAQUERO PIPELINE COMPANY 1,   §
L.L.C., INTERCONTINENTAL   §
TERMINALS MANAGEMENT   §
COMPANY AND MITSUI & CO. (U.S.A.),   §
INC.   §       **HARRIS COUNTY, TEXAS**

## AFFIDAVIT OF RICHARD SCHRIBER

Before me the undersigned notary public personally appeared Richard Schriber who after being duly sworn and deposed stated under oath: my name is Richard Schriber, I am over the age of 18, of sound mind, competent to make this affidavit and every statement contained herein is true, correct and within my personal knowledge.

1.     I am the Project Manager of Alamo Environmental, Inc. d/b/a Alamo1. Alamo1 is a Texas corporation which provides services as a full service contractor that specializes in industrial construction, demolition, remediation, abatement, technical services, waste transportation, emergency response, recycling, health and safety compliance. I was the project manager with regard to the phenol spill made the basis of this lawsuit.

2.     In June 2006 , Alamo1 responded to a phenol spill which resulted form a pipeline breakage within a 12" easement leased by Vaquero but extended well beyond the easement to property owned by Mitsui and managed by ITMC. The property where the response was done is described generally as 2700 Tidal Road, La Port, Texas 77571, Harris County, Texas. The property is described legally as:

THE FOLLOWING IS A CENTERLINE DESCRIPTION OF A PROPOSED TWELVE INCH (12") PHENOL PIPELINE EXTENDING OVER, THROUGH, ALONG AND ACROSS THE RESIDUE OF 98.6698 ACRES OF LAND SITUATED IN GEORGE ROSS SURVEY A-646, HARRIS COUNTY, TEXAS, MORE PARTICULARLY DESCRIBED IN SPECIAL WARRANTY DEED FROM FLUOR CONSTRUCTORS, INC. TO MITSUI & CO. (U.S.A.), INC., RECORDED UNDER COUNTY COURT'S FILE NUMBER H826946, (FILM CODE 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) OFFICIAL PUBLIC RECORDS OF REAL PROPERTY, HARRIS COUNTY, TEXAS AND THE RESIDUE OF 85.3667 ACRES OF

1

LAND SITUATED IN THE GEORGE ROSS SURVEY, A-646, HARRIS COUNTY, TEXAS. MORE PARTICULARLY DESCRIBED IN CORRECTION WARRANTY DEED FROM ROLLINS PROPERTIES, INC. TO MITSUI & CO. (U.S.A.), INC. RECORDED UNDER COUNTY CLERK FILE NUMBER E892213 (FILM CODE 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), OFFICIAL PUBLIC RECORDS OF REAL PROPERTY, HARRIS COUNTY, TEXAS WITH A MEADS AND BOUNCE DESCRIPTION ATTACHED HERETO AS EXHIBIT "A".

3.   Intercontinental Terminals Management Co. operates the facility and land owned by Mitsui as described above for hire bulk liquid storage facility that stores a variety of chemicals and petro chemicals.  Defendant Intercontinental Terminals Management Co. is an agent of Mitsui & Co. (U.S.A.), Inc. wherein they provided for Mitsui among other things a systematic, proactive approach to prevention of accidental releases of hazardous chemicals.   Their system includes but is not limited to the following:

   a.   A process hazard analysis;
   b.   Operating procedure;
   c.   Training;
   d.   Management of Claim;
   e.   Prestart up review;
   f.   Compliance audit; and
   g.   Accident investigation;

4.   Defendants, Vaquero Pipeline Company, L.P. and Vaquero Pipeline Company 1, LLC (hereinafter referred to as Vaquero) is the pipeline lessee under an easement with Defendant Mitsui which is attached hereto as Exhibit "B".  Thus, Vaquero leases the pipeline and is managed and over seen by ITMC on land owned by Mitsui.

5.   Phenol spills pose a severe health hazard and need to be handled with extreme caution.  Phenol is highly corrosive to the skin and readily absorb through it, where upon it can affect the central nervous system and cause damage to the liver and kidneys.  When heated, phenol will produce flammable vapors that are highly toxic (just a few parts per million and explosive) at concentrations of three percent to ten percent in air.

6.   The remediation required of the surrounding soil which resulted from the phenol spill was substantial and went from June 2006 through November 2006.   It required 24 hour a day watch and monitoring.  Over $437,111.51 was spent in disposal charges.  They include incineration charges of $146,703.43 as seen in Invoice No. AH06155X1 and $186,524.48 in incineration charges as demonstrated in Invoice No. AH-06-155X3.  Additionally, there is burial disposal

2

of $25,035.48 as seen in Invoice No. AH06-155X and another $9,203.22 of burial disposal charges as seen in Invoice No. AH06-155X5. Finally, there was liquid disposal of $36,436.40 as seen in Invoice No. AH06-155X1 and an additional $33,208.50 as seen in Invoice No. AH06-155X3. Labor charges totaled $236,231.25 through September 2006 with an additional $248,119.98 in subcontractor charges from October 2006 through November 2006. Additionally, Alamo spent $161,436.25 in equipment charges. The total charges as seen on the chart attached hereto incurred by Alamo are $1,127,833.99. This includes several thousand tons of soil actually removed, disposed of and/or remediated not just in the area covered by the easement leased by Vaquero but on a ½ to 1 acre area of land actually owned by Mitsui, not subject to the lease. It was agents of Mitsui and in particular employees of Defendant, ITMC and the consultant, Michael E. Edmondson which directed aspects of the remediation in this case. In particular, Gary Carroll, Carl Holly and individual Max, an employee of ITMC and the consultant, Michael E. Edmondson directed and controlled entrance and exit to the facilities. Michael E. Edmondson further provided what material was to be removed and what depths and lengths the material was to be removed. This was all on Mitsui's land and it was Mitsui's land and not just the area of the pipeline easement which was improved. It was clear to all parties involved that Vaquero and ITMC were authorized agents of Mitsui regarding the work Alamo1 performed.

In fact during the course of the project there were subsequent discharges and rains which required Alamo to remediate soils not previously contaminated again at the request and direction of Mitsui's agents on Mitsui's land.

7.    As seen in the attachments, Alamo billed Vaquero each month work was performed. Alamo further provided notices to ITMC as well as Mitsui of these unpaid amounts for valuable remediation work which they knew they were receiving and which they specifically requested from Alamo1.

8.    Alamo timely filed Mechanic's Liens and sent notices to Mitsui and ITMC in accordance with the Texas Property Code. The Mechanic's Lien included the following:

   1.    A sworn statement of the amount claimed;

   2.    The name and last known address of the owner or reputed owner;

   3.    A general statement of the kind of work done and materials furnished by the Claimant, even though not necessary as Plaintiff was an original contractor a statement of each month in which the work was performed and materials furnished for which payment was requested;

   4.    The name and last known address of the person by whom the Claimant

3

was employed or to whom the Claimant furnished the materials or labor;

5.  The name and last known address of the original contractor, even though it was Plaintiff;

6.  A description legally sufficient for the identification, of the property sought to be charged with the lien;

7.  The Claimant's name, mailing address and physical address;

8.  A statement identifying the date each notice of the claim was sent to the owner and the method in which it was sent.

Further Affiant sayeth not.

_____
RICHARD SCHRIBER

SUBSCRIBED AND SWORN TO BEFORE ME by the said RICHARD SCHRIBER on this the ___9___ day of June, 2008, to certify which witness my hand and seal of office.

TAMARA KAY FILLINGAME
Notary Public, State of Texas
Commission Expires 6-25-11

_____
Notary Public, State of Texas

4

5957-069 Affidavit of Richard Schriber 1

2019-86194 / Court: 133

# EXHIBIT 10

Filing Number: 30166700

 05-102 (Rev.9-15/33) FORM

## Texas Franchise Tax Public Information Report

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP), Professional Associations (PA) and Financial Institutions*

■ **Tcode** 13196 Franchise

| ■ Taxpayer number | ■ Report year |
|---|---|
| 1 7 4 1 7 0 6 4 6 0 1 | 2 0 1 8 |

*You have certain rights under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381.*

Taxpayer name: **INTERCONTINENTAL TERMINALS MANAGEMENT COMPANY** ■    ○ Blacken circle if the mailing address has changed.

Mailing address: **2424 HAZARD STREET**

| City | State | ZIP code plus 4 | Secretary of State (SOS) file number or Comptroller file number |
|---|---|---|---|
| **HOUSTON** | **TX** | **77019** | **0030166700** |

● Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| Principal office | 2424 HAZARD STREET  HOUSTON TX 77019 |
|---|---|
| Principal place of business | 2424 HAZARD STREET  HOUSTON TX 77019 |

*You must report officer, director, member, general partner and manager information as of the date you complete this report.*

*Please sign below!* **This report must be signed to satisfy franchise tax requirements.**

1741706460118

**SECTION A**   Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | | Term expiration | m m d d y y |
|---|---|---|---|---|---|
| **STEPHEN W MILES** | **PRES** | ● YES | | | 1 2 3 1 1 8 |
| Mailing address **2424 HAZARD STREET** | City **HOUSTON** | State **TX** | | ZIP Code **77019** | |
| **MARILYN R MILES** | **TREASURER** | ● YES | | | 1 2 3 1 1 8 |
| Mailing address **2424 HAZARD STREET** | City **HOUSTON** | State **TX** | | ZIP Code **77019** | |
| **STEPHEN W MILES JR** | **VP** | ● YES | | | 1 2 3 1 1 8 |
| Mailing address **2424 HAZARD STREET** | City **HOUSTON** | State **TX** | | ZIP Code **77019** | |

**SECTION B**   Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| **NONE** | | | |
| | | | |

**SECTION C**   Enter information for each corporation, LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| **NONE** | | | |

Registered agent and registered office currently on file *(see instructions if you need to make changes)*     *You must make a filing with the Secretary of State to change registered agent, registered office or general partner information.*

Agent: **NORMAN T REYNOLDS**

| Office: **THREE RIVERWAY STE 1800** | City **HOUSTON** | State **TX** | ZIP Code **77056** |
|---|---|---|---|

The information on this form is required by Section 171.203 of the Tax Code for each corporation, LLC, LP, PA or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related corporation, LLC, LP, PA or financial institution.

| sign here | *Marilyn R Miles* | Title *Treasurer* | Date *4/6/18* | Area code and phone number (713) 503 - 9411 |
|---|---|---|---|---|

**Texas Comptroller Official Use Only**

05-102|(Rev.9-15/33)|13196|17417064601|2018|Mon Apr 02 2018 16: 00:40 GMT-0500 (Central Daylight Time)|9997|0|

| VE/DE ○ | PIR IND ○ |
|---|---|



# EXHIBIT A-2

CAUSE NO. 2019-86194

| | | |
|---|---|---|
| TOTAL PETROCHEMICALS & REFINING USA, INC. and TOTAL SPECIALTIES USA, INC., | §<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | HARRIS COUNTY, TEXAS |
| INTERCONTINENTAL TERMINALS COMPANY LLC and INTERCONTINENTAL TERMINALS MANAGEMENT COMPANY, | §<br>§<br>§<br>§<br>§ | |
| Defendants. | § | 133rd JUDICIAL DISTRICT |

## DEFENDANT INTERCONTINENTAL TERMINALS COMPANY LLC'S MOTION TO TRANSFER VENUE AND, SUBJECT THERETO, <u>ORIGINAL ANSWER</u>

Defendant Intercontinental Terminals Company LLC ("Defendant") files its Motion to Transfer Venue and, subject thereto, Original Answer to Plaintiffs' Original Petition (the "Petition").

### I.      Motion to Transfer Venue

Pursuant to Rule 257 of the Texas Rules of Civil Procedure, Defendant respectfully requests that venue for this action be transferred from Harris County to another county of proper venue under the Texas Civil Practice and Remedies Code.  Defendant will supplement the record with a brief in support of its motion and necessary affidavit upon completion of sufficient discovery.

### II.      General Denial

Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Defendant generally denies the allegations and claims set forth in Plaintiffs' Petition and demands strict proof thereof

by a preponderance of the credible evidence, as required by the Constitution and laws of the State of Texas.

### III.     Affirmative Defenses

1.      Plaintiffs fail to state a claim upon which relief can be granted.

2.      Plaintiffs' claims are barred because Plaintiffs lack standing to bring, in whole or in part, the claims alleged in the Petition.

3.      Plaintiffs' claims are barred in whole or in part by the economic loss rule under applicable law.

4.      Defendant asserts the defense of contributory or comparative negligence to the extent that the damages and injuries alleged in Plaintiffs' Petition were legally and proximately caused, in whole or in part, by the negligence, fault, negligence per se, and other culpable conduct of other persons or parties who failed to exercise the requisite degree of care and caution, entitling Defendant to have the Court and jury apply the doctrine of comparative negligence established by Tex. Civ. Prac. & Rem. Code § 33.001 *et seq.* to reduce any judgment against it by the degree of negligence or fault attributable to any other person or party.

5.      Defendant asserts the defense of superseding or intervening cause to the extent that the damages and injuries alleged in Plaintiffs' Petition were legally and proximately caused by separate and independent events or agencies that were not the result of Defendant's actions or reasonably foreseeable to Defendant or within its control.

6.      Defendant denies that the alleged injuries of Plaintiffs were proximately caused by any alleged act or omission of Defendant.

7.      As an affirmative defense, the evidence may show that one or more claims of Plaintiffs are barred in whole or in part by the failure to mitigate damages.

8.      As an affirmative defense, the evidence may show that one or more of Plaintiffs' claims are barred in whole or in part by the doctrine of waiver.

9.      All conduct and activities of Defendant, as alleged in the Petition, conformed to applicable statutes, government regulations, government-issued permits, and industry standards based upon the state of knowledge at the time alleged in the Petition and/or were taken at the specific direction of or in conjunction with or with approval or ratification by federal, state, and/or local governmental authorities.

10.     Alternatively, should any amount be cast against Defendant in judgment, Defendant is entitled to a credit and off-set for any and all payments made to Plaintiff for any purpose arising out of the incident and/or claims made the subject of this litigation, including, but not limited to, settlement credits.

11.     Defendant denies any liability for punitive or exemplary damages.  In any event, Plaintiffs' claims for exemplary damages are limited by Tex. Civ. Prac. & Rem. Code § 41.008.

12.     Defendant denies any liability for punitive or exemplary damages.  In any event, Plaintiffs' claim for punitive damages against Defendant cannot be sustained because an award of punitive damages under Texas law without proof of every element beyond a reasonable doubt would violate Defendant's rights under Amendments IV, V, VI, and XIV of the United States Constitution and under Sections 9, 10, 14, and 19 of Article I of the Texas Constitution.

13.     Defendant denies any liability for punitive or exemplary damages.  In any event, Plaintiffs' claims for punitive damages against Defendant cannot be sustained because an award of punitive damages under Texas law by a jury that (1) is not provided any standard of sufficient clarity for determining the appropriateness or the appropriate size of any punitive

damages award; (2) is not instructed on the limits of punitive damages imposed by the applicable principles of deterrence and punishment; (3) is not expressly prohibited from awarding punitive damages or determining the amount of an award of punitive damages, in whole or in part, on the basis of invidiously discriminatory characteristics; (4) is permitted to award punitive damages under a standard for determining liability for punitive damages that is vague and arbitrary and does not define with sufficient clarity the conduct or mental state that makes punitive damages permissible; and (5) is not subject to judicial review on the basis of objective standards, would violate Defendant's due process rights guaranteed by the Fourteenth Amendment to the United States Constitution and by Section 19 of Article I of the Texas Constitution.

14.     Defendant denies any liability for punitive or exemplary damages.  In any event, a punitive damages award would violate the prohibition against excessive fines contained in the Eighth Amendment to the United States Constitution, as embodied in the due process clause of the Fourteenth Amendment to that Constitution, and Article I, § 19 of the Texas Constitution.

15.     Defendant reserves the right to assert other affirmative defenses, cross-claims, and designations of responsible third parties as discovery proceeds.

### IV.     Right to Amend

Defendant reserves the right to amend this Answer.

### V.     Request for Jury

Defendant requests a trial by jury and will pay the required fee in accordance with the deadlines imposed by the Texas Rules of Civil Procedure.

## VI.     Prayer

Defendant requests that this Court, after trial or final hearing of this case, enter judgment in Defendant's favor, that Plaintiffs take nothing by reason of this suit, and that the Court award Defendant its costs of court and expenses and all other relief to which it is entitled.

Respectfully submitted,

BAKER BOTTS L.L.P.

By:  /s/ Russell C. Lewis
        Russell C. Lewis
        Texas Bar No. 24036968
        Michael S. Goldberg
        Texas Bar No. 08075800
        Benjamin Gonsoulin
        Texas Bar No. 24099682
        Kelly Hanen
        Texas Bar No. 24101862
        Elizabeth Furlow
        Texas Bar No. 24109899
        One Shell Plaza
        910 Louisiana Street
        Houston, Texas 77002-4995
        Telephone:  (713) 229-1767
        Facsimile:   (713) 229-2867
        russell.lewis@bakerbotts.com
        michael.goldberg@bakerbotts.com
        ben.gonsoulin@bakerbotts.com
        kelly.hanen@bakerbotts.com
        elizabeth.furlow@bakerbotts.com

PHELPS DUNBAR LLP

By: _/s/ Ivan M. Rodriguez_____
       Ivan M. Rodriguez
       Texas Bar No. 24058977
       Marc G. Matthews
       Texas Bar No. 24055921
       Michael E. Streich
       Texas Bar No. 24079408
       500 Dallas, Suite 1300
       Houston, Texas  77002
       Telephone:  (713) 626-1386
       Telecopier:  (713) 626-1388
       Ivan.rodriguez@phelps.com
       Marc.matthews@phelps.com
       Michael.streich@phelps.com

ATTORNEYS FOR DEFENDANT
INTERCONTINENTAL TERMINALS
COMPANY LLC

## CERTIFICATE OF SERVICE

This certifies that a copy of the above and foregoing was sent by electronic mail to the following counsel of record on this 3rd day of January 2020:

Shawn Raymond
Erica W. Harris
Michael C. Kelso
Susman Godfrey LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
sraymond@susmangodfrey.com
eharris@susmangodfrey.com
mkelso@susmangodfrey.com
*Attorneys for Plaintiffs Total Petrochemicals & Refining USA, Inc. and Total Specialties USA, Inc.*

F. Daniel Knight
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, Texas 77002-4310
Telephone:  (713) 658-2571
Facsimile:  (713) 356-1152
daniel.knight@chamberlainlaw.com
*Attorneys for Defendant Intercontinental Terminals Management Company*

*/s/ Russell C. Lewis*
Russell C. Lewis